**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x

IN RE LIONS GATE ENTERTAINMENT
CORP. SECURITIES LITIGATION

-------------------------------------------------------- x

:   Case No. 1:14-cv-05197-JGK
:
:   **<u>CLASS ACTION</u>**
:
:   **AMENDED CLASS ACTION**
:   **COMPLAINT FOR VIOLATIONS OF**
:   **THE FEDERAL SECURITIES LAWS**
:
:   Jury Trial Demanded
:

## TABLE OF CONTENTS

I.     INTRODUCTION ....................................................................................................1

II.    JURISDICTION AND VENUE ...............................................................................5

III.   PARTIES ..................................................................................................................5

       A.    Plaintiffs .......................................................................................................5

             1.    Lead Plaintiff ......................................................................................5

             2.    Additional Plaintiff .............................................................................6

       B.    Defendants ....................................................................................................6

             1.    The Company ......................................................................................6

             2.    The Individual Defendants..................................................................6

IV.    SUBSTANTIVE ALLEGATIONS ..........................................................................8

       A.    Lionsgate's Initial Attempts to Impede or Block Icahn's Acquisition ....................8

       B.    Lionsgate Sets the Stage for the Transactions ........................................10

       C.    Lionsgate Effectuates the Transactions as a Standstill with Icahn Expires ...........12

       D.    Lionsgate Capitalizes on Misrepresentations Concerning the Transactions..........15

V.     DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS DURING
       THE CLASS PERIOD ............................................................................................17

       A.    Third Quarter Fiscal 2013 Results ............................................................18

       B.    Fourth Quarter and Full Year Fiscal 2013 Results .................................19

       C.    First Quarter Fiscal 2014 Results..............................................................20

       D.    Second Quarter Fiscal 2014 Results .........................................................21

       E.    Third Quarter Fiscal 2013 Results ............................................................22

VI.    THE SEC INVESTIGATION AND ORDER ARE PUBLICLY DISCLOSED
       AND THE TRUTH IS REVEALED .....................................................................24

VII.   ADDITIONAL SCIENTER ALLEGATIONS.......................................................25

       A.    Defendants Publicly Acknowledged During the Class Period that a "Legal
             Proceeding" Went "[B]ack [S]everal [Y]ears" ......................................26

       B.    The Individual Defendants Signed Statements Certifying that They Were
             Responsible for Lionsgate's Financial Statements ..................................27

       C.    Defendants Exhibited a Pattern of Failing to Disclose Material
             Information About the Transactions and Their Consequences..............................29

             1.    Defendants Violated Numerous SEC Regulations in Failing to
                   Disclose Material Information About the SEC Investigation and
                   Related Risks ....................................................................................29

2.      Defendants Violated Generally Accepted Accounting Principles in Failing to Disclose the SEC Investigation and Related Risks ...................33

VIII.   THE SEC FINE, AND THE PROSPECT OF MORE SEVERE PENALTIES, WERE MATERIAL TO THE COMPANY ....................................................................34

IX.     LOSS CAUSATION...............................................................................................................35

X.      APPLICABILITY OF PRESUMPTION OF RELIANCE..................................................40

XI.     CONTROL PERSON ALLEGATIONS / GROUP PLEADING.....................................41

XII.    INAPPLICABILITY OF SAFE HARBOR ........................................................................43

XIII.   CLASS ACTION ALLEGATIONS .....................................................................................45

COUNT I ...........................................................................................................................................47

        Violation of § 10(b) of the Exchange Act and Rule 10b-5 ..................................................47

COUNT II ..........................................................................................................................................48

        Violation of § 20(a) of the Exchange Act.........................................................................48

XIV.    PRAYER FOR RELIEF ........................................................................................................50

XV.     JURY DEMAND .....................................................................................................................50

CERTIFICATE OF SERVICE ........................................................................................................53

Court-appointed Lead Plaintiff KBC Asset Management NV ("KBC" or "Lead Plaintiff") and additional plaintiff Amado Santos (as defined fully below) (together, "Plaintiffs"), individually and on behalf of a class of similarly situated persons and entities, by its undersigned attorneys, allege the following against Lions Gate Entertainment Corporation ("Lionsgate" or the "Company") and the Individual Defendants named herein, upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters.

Plaintiffs' information and belief as to allegations concerning matters, other than itself and its own acts, is based upon, among other things, a review and analysis of:  (i) press releases, news articles, transcripts, and other public statements issued by or concerning Lionsgate and the Individual Defendants; (ii) research reports issued by financial analysts concerning Lionsgate's business; (iii) reports filed publicly by Lionsgate with the Securities and Exchange Commission ("SEC"); (iv) an investigation conducted by and through Lead Plaintiff's attorneys; and (v) other publicly available information and data concerning Lionsgate, its securities, and the markets therefor.  Plaintiffs believe that substantial additional evidentiary support for the allegations herein exists and will continue to be revealed after Plaintiffs have a reasonable opportunity for discovery.

## I.      INTRODUCTION

1.      Plaintiffs bring this federal securities class action on behalf of themselves and all other purchasers of Lionsgate common stock from February 11, 2013, through March 13, 2014, inclusive ("Class Period"), seeking to pursue remedies against the Company and four of its senior executives (collectively, "Defendants," as further defined below) under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule l0b-5.

2.      Defendant Lionsgate is a film studio that produces and distributes motion pictures, television programs, and other forms of home entertainment.  By the start of the Class Period, unbeknownst to investors, the SEC was investigating Lionsgate (the "SEC Investigation") for

making false and misleading statements concerning a series of transactions entered into and consummated in an effort to prevent a hostile takeover of the Company by Carl Icahn and his affiliates (collectively, "Icahn").  As detailed herein, Lionsgate settled the SEC Investigation by agreeing to pay $7.5 million in fines (the "SEC Settlement"), acknowledging that its conduct violated the federal securities laws, and consenting to entry of an *Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order*, issued on or about March 13, 2014 (the "Order").  On March 13, 2014, the SEC Settlement was announced and the price of Lionsgate stock consequently declined, damaging investors.

3.      The SEC Investigation centered on Lionsgate's battle with Icahn and Defendants' false statements concerning actions taken by the Company's board of directors (the "Board") in reaction to Icahn's shareholder activism.  Beginning in or about March 2010, Icahn commenced a series of tender offers aimed at further increasing his ownership in the Company and allowing him to designate his chosen representatives to the Board to facilitate a takeover.  Icahn ultimately secured a 37.9% stake in the Company.

4.      Threatened by the prospect of losing control of the Company — or worse, losing their jobs — Lionsgate's management and Board sought to block Icahn's takeover attempt by any means.  One such effort was to negotiate the acquisition of another movie production company, rumored to be Metro-Goldwyn-Mayer Inc. ("MGM").  Icahn entered into a standstill agreement with Lionsgate, scheduled to expire on July 19, 2010, at 11:59 p.m., to allow negotiations with MGM to take place.

5.      By mid-2010, negotiations with MGM were unsuccessful and Icahn had not relented.  Expecting Icahn to launch another tender offer after the standstill expired, Lionsgate

pursued a more heavy-handed measure, planned as early as June 2010, to keep Icahn at bay: significantly diluting Icahn's stake in the Company by placing enough stock in the hands of a friendly director, Mark Rachesky, to successfully oppose any hostile overture by Icahn.

6.      The Board met one minute after midnight on July 20, 2010, immediately after the standstill expired and, with management's assistance, approved and facilitated what the SEC has characterized as a "set of [three] extraordinary corporate transactions" (collectively, the "Transactions") that resulted in placing over 16 million shares of Lionsgate common stock in the hands of Mr. Rachesky and/or entities he controlled (collectively, "Rachesky"). The Transactions increased Rachesky's ownership interest to 28.8% of the Company's outstanding common stock, while reducing Icahn's ownership interest to 32.8%.

7.      To avoid the regulatory requirements, oversight, and delays associated with a direct sale to Rachesky due to his status as a Lionsgate director, the Transactions used a straw man, Kornitzer Capital Management Inc. ("Kornitzer"). The Board also exempted the Transactions from the Company's insider-trading policies and otherwise structured them to avoid the need for shareholder approval under New York Stock Exchange ("NYSE") rules.

8.      Kornitzer held $99.7 million worth of notes in Lionsgate, and the conversion price made it economically unfeasible for Kornitzer to convert the notes into common stock for the purpose of diluting Icahn's holdings. With the facilitation of management and the Board, however, Lionsgate replaced Kornitzer's notes with new notes whose conversion price was approximately at market value, virtually assuring that the notes would be converted. To further the insiders' plans, Kornitzer sold the new notes at a premium to Rachesky, who soon thereafter converted the notes to common stock.

9.     The Transactions resulted in an assured payout to Kornitzer at a price negotiated with management and the Board and, in the process, had the intended effect of substantially increasing Rachesky's ownership interest in the Company while correspondingly diluting the interest of every other Lionsgate shareholder — including Icahn.  With Icahn's ownership interest diluted, Icahn's takeover threat was effectively subdued.  Icahn was forced to accept defeat and later sold his stake in a negotiated settlement with Lionsgate and Rachesky.

10.     On July 20, 2010, Lionsgate announced the Transactions and represented that they were "a key part of the Company's previously announced plan to reduce its total debt, as well as its nearer term maturities."  This representation failed, however, to disclose the true purpose of the Transactions — i.e., to defend the Company against the threat of a takeover by Icahn.  Indeed, as set forth by the SEC in its Order, Lionsgate had *never* announced a plan to reduce debt, and, in fact, it had plans to *increase* debt to fund motion pictures during the ordinary course of its operations.  Following the announcement of the Transactions, Lionsgate continued to claim they were not part of a pre-arranged plan to dilute Icahn's interest.

11.     By the start of the Class Period, Defendants knew that the SEC was investigating Lionsgate for its statements concerning the Transactions and that the NYSE had initiated a separate inquiry as to whether the Transactions violated Section 312.03(b) of the NYSE Listed Company Manual, which ostensibly required shareholder approval of the pre-arranged Transactions.  Defendants further knew or recklessly disregarded that the existence of the SEC Investigation, given the nature of the underlying subject matter, exposed the Company to a series of material risks and uncertainties, including regulatory proceedings, sanctions, and fines.

12.     In response to the public dissemination of the Order on March 13, 2014, the price of Lionsgate common stock dropped by more than 9% — from $33.26 to $30.33 per share — from

the close of the market on March 12, 2014, to the close of the market on March 17, 2014, wiping out more than $400 million in market capitalization.  Accordingly, as a result of the revelation of the SEC Investigation and truth concerning Lionsgate's regulatory exposure, Plaintiffs and other purchasers of Lionsgate stock during the Class Period were damaged.

## II.     JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as Lionsgate maintains an office located within this District at 75 Rockefeller Plaza, New York, New York 10019, the Company's shares are publicly traded on the NYSE, and many of the acts and practices complained of herein occurred in substantial part in this District.

15.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.      Plaintiffs

#### 1.      Lead Plaintiff

16.     On October 28, 2014, this Court appointed KBC to serve as Lead Plaintiff in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

17.     KBC is a large institutional investor based in Belgium that provides financial and investment services.  As part of KBC's asset management services, it is responsible for managing mutual funds, private funds and institutional funds.  KBC has approximately €155 billion

($215 billion) of assets under management.  As set forth in its PSLRA certification previously filed with the Court, KBC purchased Lionsgate common stock during the Class Period and suffered damages as a result of the securities law violations alleged herein.

### 2.      Additional Plaintiff

18.      Amado Santos is a California resident and retired mechanical engineer with a postgraduate management degree.  As set forth in his PSLRA certification previously filed with the Court, Mr. Santos purchased Lionsgate common stock during the Class Period and suffered damages as a result of the securities law violations alleged herein.

### B.      Defendants

### 1.      The Company

19.      Defendant Lionsgate is a global multimedia conglomerate that has become a market leader in the production and distribution of motion pictures and other forms of entertainment.  At all relevant times, Lionsgate's common stock traded on the NYSE under the ticker symbol "LGF."

### 2.      The Individual Defendants

20.      Defendant Jon Feltheimer ("Feltheimer") is, and was throughout the Class Period, Lionsgate's Chief Executive Officer ("CEO") and a member of its Board, positions he has held since March 2000.  Feltheimer also served as Co-Chairman of the Board until February 2012. According to the Company, Feltheimer is and was at all relevant times responsible for the day-to-day supervision, management, and control of the business and affairs of Lionsgate, developing its strategic direction and serving as a bridge between management and the Board.  Feltheimer was included in the definition of "key manager" in a credit agreement entered into by Lionsgate, and participated in conference calls with investors and analysts concerning Lionsgate's business, operations and financial performance.  Feltheimer was involved in planning, negotiating, and effectuating the Transactions.

6

21.     Defendant James Keegan ("Keegan") served as Lionsgate's Chief Administrative Officer from April 2002 to October 2013 and Chief Financial Officer ("CFO") from September 2002 to October 2013.  During his tenure as CFO, Keegan participated in conference calls with investors and analysts concerning Lionsgate's business, operations, and financial performance.  By agreement dated September 19, 2013, Keegan agreed to serve as a financial "consultant" for Lionsgate from October 1, 2013 — when his tenure as CFO was scheduled to conclude — until January 3, 2014.

22.     Defendant James Barge ("Barge") is Lionsgate's CFO and has served in that capacity since October 1, 2013, when he replaced Keegan in that position.  During his tenure as CFO, Barge participated in conference calls with investors and analysts concerning Lionsgate's business, operations, and financial performance.

23.     Defendant Michael Burns ("Burns") is, and was throughout the Class Period, Lionsgate's executive Vice Chairman and a member of the Board, positions he has held since March 2000 and August 1999, respectively.  According to the Company, Burns, together with Feltheimer, is and was at all relevant times responsible for the day-to-day supervision, management, and control of the business and affairs of Lionsgate, developing its strategic direction, and serving as a bridge between management and the Board.  Burns was included in the definition of "key manager" in a credit agreement entered into by Lionsgate, and participated in conference calls with investors and analysts concerning Lionsgate's business, operations, and financial performance.   He was involved in planning, negotiating, and effectuating the Transactions.

24.     Defendants Feltheimer, Keegan, Barge, and Burns are referred to herein collectively as the "Individual Defendants" and, together with Lionsgate, as "Defendants."

7

## IV.   SUBSTANTIVE ALLEGATIONS

25.     In the Order, Lionsgate admitted certain facts set forth therein and "acknowledge[d] that its conduct violated the federal securities laws."  Specifically, "[Lionsgate] violated Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder and Exchange Action Section 14(d) and Rule 14d-9 thereunder."  The facts admitted in "Annex A" to the Order largely form the basis of the allegations herein concerning the background and terms of the Transactions.  The Order is incorporated by reference herein and attached hereto as Exhibit 1.

### A.   Lionsgate's Initial Attempts to Impede or Block Icahn's Acquisition

26.     In 2008, Icahn began acquiring a stake in Lionsgate with the stated intent of securing control of the Company.  By February 2009, Icahn had acquired beneficial ownership of 14.28% of Lionsgate's outstanding shares; by February 2010, his beneficial holdings had increased to 18%.

27.     Icahn made various overtures to Lionsgate concerning his interest in acquiring control.  Lionsgate's management and Board were not receptive to Icahn's overtures, and refused his demand to appoint up to five of the twelve members of the Board or to accept a slate of other conditions he had proposed.  Feltheimer was at least partially responsible for communicating with Icahn on behalf of the Company.

28.     As Icahn's efforts to acquire the Company intensified and he threatened a proxy contest, the Company's management and Board intensified their efforts to entrench themselves, discredit Icahn, and mount a takeover defense.  For example, on or about June 9, 2009, Lionsgate entered into an agreement with Rachesky, whereby it agreed to nominate Rachesky to the Board in exchange for his promise to vote his 19.9% stake in the Company in support of the Board's slate of directors — further solidifying the insiders' grip on the Company.  As a result, Rachesky was elected to the Board at the 2009 Annual Meeting on September 15, 2009.

29. In February 2010, Icahn publicly expressed an intention to conduct a partial tender offer at $6.00 per share — a premium of $0.55 over the closing price the previous day — to increase his stake to 29.9% of the Company's outstanding shares.

30. On February 26, 2010, the Board re-ratified its Special Committee of purportedly independent directors (formed in February 2009), to evaluate and negotiate any proposal by Icahn (the "Special Committee"). On March 1, 2010, Icahn launched his tender offer. The Board, based on the Special Committee's recommendation, quickly concluded that Icahn's offer was "financially inadequate and coercive" and, on March 11, 2010, adopted a shareholder rights plan ("poison pill").

31. The poison pill was designed to prevent the third-party acquisition of 20% or more of Lionsgate's outstanding voting shares (or 24.9%, if it completed an offering after March 12, 2010). If the acquisition threshold was reached and the poison pill was triggered, Icahn's interests would be significantly diluted and acquiring majority control of the stock would be prohibitively expensive, if not impossible. Subsequently, in late April 2010, Canadian securities regulators voided the poison pill, paving the way for Icahn to continue increasing his stake in the Company without the risk of triggering it.

32. On March 19, 2010, Icahn amended the terms of his tender offer in two ways: first, he agreed to accept *all* tendered shares — even those above the 29.9% threshold in his original offer — and second, he imposed a condition that he would not be required to accept tendered shares unless they provided him with a minimum of 50.1% of Lionsgate's outstanding shares. In response, Lionsgate issued a statement on March 23, 2010, from Feltheimer, who stated "the offer remains financially inadequate and still does not reflect the full value of Lionsgate shares."

33.     On April 15, 2010, Icahn further amended his offer by increasing the consideration payable to $7.00 per share.  Even at $7.00 per share, however, the Company characterized the offer as "financially inadequate, coercive and opportunistic."  In a June 14, 2010 letter, Feltheimer and Burns stated:

> The financial inadequacy of the Icahn Group's offer has become more pronounced since the time that the original offer was launched, as Lionsgate continues to successfully execute its business strategy.  The average price target of Wall Street analysts for Lionsgate shares as of June 11, 2010 is $8.85, a 26.4% premium to the Icahn Group's offer price of U.S. $7.00 per share.

34.     Despite continuous efforts by Lionsgate's management and Board to undermine Icahn and impede his acquisition offers, Icahn managed to increase his stake to 37.9% of the Company's outstanding shares by July 1, 2010.

**B.      Lionsgate Sets the Stage for the Transactions**

35.     When their strategy to thwart Icahn's takeover attempts fell short, Lionsgate's management and Board began to explore a more aggressive approach that would put voting rights in the hands of someone supportive of management and, in the process, significantly dilute Icahn's interest.  Notably, Lionsgate could have achieved this objective via a direct stock issuance and sale to a management-friendly director, such as Rachesky.  But an open and straightforward approach, like a direct sale, would have required prior approval from Lionsgate's shareholders, which management and the Board concluded was not practical — or desirable — given the expectation that Icahn would launch yet another tender offer to acquire the Company's shares, and the delay involved in obtaining shareholder approval.

36.     On June 30, 2010, the Special Committee and Board met regarding Icahn's efforts to acquire the Company.  At the meeting, Burns discussed with Kornitzer, which held $99.7 million in Lionsgate convertible notes, Kornitzer's interest in "a possible exchange of the notes [it] held for newly issued notes of the same value, but with a conversion rate that would make converting

the notes to common stock much more appealing."  At that time, the notes were convertible to Lionsgate common stock at Kornitzer's option and had approaching put dates of October 2011 and March 2012, when they could be put to the Company at par value.

37.    In the admitted facts set forth in Annex A to the Order, Lionsgate acknowledged that "[i]t would have made no economic sense for [Kornitzer] to convert the notes to stock at that time since the then-current market price of Lionsgate's stock was less than the conversion price of the notes."  As explained in the following example included in Annex A of the Order, in which Kornitzer is referred to as the "Note Holder":

> [I]n July 2010, [Lionsgate's] two series of convertible notes held by the Note Holder [Kornitzer] had conversion prices of $14.28 and $11.50 per share while [Lionsgate's] stock was only trading at between $6 and $7 per share.  Simply put, if the Note Holder wanted to increase the size of his [Lionsgate] stock holdings, it would have been considerably less expensive for the Note Holder to buy stock in the market than to convert the notes he owned to stock at those conversion rates. Buying stock in the market, however, would not have had a dilutive effect on the Shareholder, and, therefore, would not have advanced [Lionsgate] management's efforts to reduce the Shareholders' ownership stake in the Company.

38.    On July 5, 2010, Burns and Rachesky discussed a potential defensive recapitalization transaction whereby Rachesky would purchase Kornitzer's notes and convert them to common stock at the *present* market price.  On July 8, 2010, Kornitzer expressed its interest in exchanging its notes "for new notes with the more favorable conversion rate."

39.    Accordingly, Defendants successfully set the stage for the Transactions: (i) Lionsgate would exchange Kornitzer's notes for new notes convertible at market prices; (ii) Kornitzer would sell the new notes to Rachesky at a premium; and (iii) Rachesky would immediately convert the new notes into newly-issued shares of common stock, thereby diluting Icahn's interest (as well as all other shareholders').

**C.      Lionsgate Effectuates the Transactions as a Standstill with Icahn Expires**

40.      On July 9, 2010, the day after receiving Kornitzer's expression of interest in pursuing the convertible note exchange, Lionsgate and Icahn entered into a ten-day standstill agreement purportedly to allow the Company to evaluate a potential merger with a movie production company (reportedly, MGM).  According to Annex A of the Order:

> The standstill agreement, which was due to expire just after 11:59 p.m., July 19, 2010, precluded [Lionsgate] from negotiating transactions involving five percent or more of the outstanding shares of its stock and from arranging or encouraging others to do the same.

41.      In violation of the standstill agreement, Lionsgate's management and Board used the standstill period to complete negotiations with Kornitzer and Rachesky concerning the Transactions.   Indeed, communications between and among Lionsgate, Kornitzer, and/or Rachesky took place on July 15 and 18, 2010, whereby the terms of the Transactions were finalized.[1]

42.      For example, on July 15, 2010, Lionsgate sent a term sheet for the Transactions to Rachesky's legal advisors, and, on July 18, 2010, those advisors sent a draft purchase agreement to Kornitzer for the new notes.  As explained in Annex A of the Order:

> The terms of the new note indentures and [Kornitzer's] "out of the money" notes were virtually identical, but included provisions designed to encourage the holder to immediately convert the notes to stock.  For example, the new notes would convert at the market price of [Lionsgate] Stock rather than the "out of the money," above-market prices of the old notes.  This provision approximately doubled the number of shares that would be obtained upon conversion.  Also, the new note indentures did not contain restrictions in the old notes that precluded their

---

[1] Some colorful communications between the parties involved in the Transaction were ultimately disclosed by Icahn in a Schedule 14A filed with the SEC.  The communications unambiguously show that the true purpose of the pre-arranged Transactions was to dilute Icahn's interest in the Company.  For example, on July 4, 2010, Defendant Burns wrote in an email, "[W]e will win the proxy fight and dilute the s[--]t out of [Icahn in] the meantime."  In a similar vein, Rachesky wrote Defendant Burns on July 15, 2010:  "Get me all and [Icahn] may leave.  It's our only chance.  I haven't been wrong yet about him.  You have to trust me."

conversion if the conversion resulted in the note holder owning more than 4.99 percent of the Company's outstanding stock.  If this restriction had not been eliminated, [Rachesky] would have been unable to convert any portion of the notes to shares of [Lionsgate] stock because, in July 2010, [Rachesky] already was the beneficial owner of approximately 20 percent of [Lionsgate's] outstanding share. The new conversion price was later calculated to be $6.32 per share.  The expected effect of the July 20 Transactions was to increase the number of shares controlled by management and directors, thereby effectively blocking [Icahn's] takeover efforts.

43.     As the MGM merger discussions deteriorated and ended without a deal, Icahn threatened to launch another tender offer — this time, to acquire "any and all" shares for the purpose of ousting management.  In contemplation of Icahn's tender offer, Lionsgate scheduled a Special Committee meeting for 12:01 a.m. on July 20, 2010 — only one minute after the standstill agreement would expire — with a Board meeting to immediately follow.  Notwithstanding Lionsgate's efforts to finalize the Transactions during the pendency of the standstill period (which violated the standstill agreement), the meetings were scheduled after the expiration of the standstill to *avoid* violating the agreement.

44.     But Rachesky was not content merely to strike a sweetheart deal with Lionsgate that would place in his hands millions of shares of common stock in a one-off transaction dilutive to Icahn; nor was the Company finished incentivizing Rachesky to immediately convert the new notes — upon acquisition — to stock.[2]  On July 19, 2010, the night before the director meetings,

---

[2] To avoid risking their severance packages in the event that Icahn succeeded in obtaining control of Lionsgate, the Board approved an extraordinary plan in or about May 2010 to ensure that management would receive their compensation packages upon a change of control.  Specifically, under the auspices of "permit[ting] the Company's senior management team to remain focused on executing [Lionsgate's] strategy," the Board "approved the establishment of a trust . . . [to] hold approximately $16 million in cash to fund [Lionsgate's] cash severance obligations that would be due to Messrs. Feltheimer, Burns, [Co-Chief Operating Officer Steven] Beeks, [Co-Chief Operating Officer Joseph] Drake, and [General Counsel Wayne] Levin should their employment be terminated without 'cause' in connection with a 'change in control.'"  The trust was irremovable for one year, and, upon the occurrence of a change of control, would remain irrevocable pending all payments.

Rachesky requested a lower conversion price for the new notes — $6.20, instead of $6.32 — which would give him an additional 305,000 shares upon conversion; Burns fielded the request.

45.     At 12:01 a.m. on July 20, 2010 — immediately after the standstill period expired — the Special Committee, followed by the Board, met to discuss the Transactions.  Admittedly considering the dilutive effect of the Transactions, the directors approved the Transactions, including the lower $6.20 conversion price for the new Kornitzer notes — which price Rachesky had requested hours earlier.  The $6.20 conversion price was below Icahn's July 20, 2010 tender offer price of $6.50 per share; well below the $7.00 and $7.50 per share offers he later extended; and, as Icahn himself noted, far below the $8.85 per share that Lionsgate had purportedly deemed the Company was worth.

46.     Additionally, to allow Rachesky to engage in the Transactions — which would have violated the Company's insider trading policy — the Board also voted to shorten the period during which insiders were prohibited from trading stock.  The insider trading policy originally prohibited trading for 45 days, from two days before the quarter-end (i.e., June 28, 2010) through two days after an earnings announcement (expected to occur on August 11, 2010).  To facilitate the Transactions, however, the Board amended the policy to *only* prevent trading for 15 days before an earnings announcement (i.e., July 25 to August 9, 2010).  In this way, Lionsgate cleared the pathway for Rachesky's purchase and conversion of the new notes.

47.     At 1:07 a.m., after the meetings had concluded but before Lionsgate purportedly had *formally* approached Kornitzer regarding a possible note exchange, Kornitzer sent wire instructions to Rachesky for the sale of the new notes at a purchase price in excess of $105 million (including a 5% premium over the face value of the notes).  It was not until 1:47 a.m. that Lionsgate

formally contacted Kornitzer to determine if it was interested in a note exchange. Unsurprisingly, only one minute later, Kornitzer replied that it would be "amenable" to the proposal.

48.     By 4:00 a.m., Lionsgate and Kornitzer had signed the exchange agreement, whereby the Company had agreed to replace Kornitzer's old notes with new notes at a $6.20 conversion price. At 6:30 a.m., Lionsgate learned that Icahn had launched his threatened tender offer at $6.50 per share. At 6:45 a.m., Rachesky emailed Kornitzer a revised purchase agreement and, by 9:30 a.m., Rachesky had purchased the new notes from Kornitzer.

49.     Shortly thereafter, Rachesky converted the new notes into 16,236,305 newly issued shares of Lionsgate stock at $6.20, representing approximately 9% of the Company's outstanding shares of common stock *after* the conversion. As a consequence of the significant dilution resulting from the Transactions, Icahn's interest in Lionsgate *declined* from 37.87% to 33.5%. By contrast, Rachesky's interest in Lionsgate *increased* from 19.99% to 28.9%.

### D.     Lionsgate Capitalizes on Misrepresentations Concerning the Transactions

50.     On July 20, 2010, following the consummation of the Transactions, Lionsgate issued a press release, annexed as an exhibit to a Form 8-K, announcing that the Company "had completed a deleveraging transaction in which approximately $100 million of its senior subordinated notes were converted into common shares at an effective conversion price of $6.20 per share." The press release further disclosed that the notes were converted into 16,236,305 common shares. The press release described the Transactions as "a key part of the Company's previously announced plan to reduce its total debt, as well as its nearer term maturities."

51.     Yet, Lionsgate had never announced a plan to reduce its debt, and, in fact, the Company previously stated plans to *increase* its debt to fund motion pictures during the course of its operations. Indeed, unbeknownst to public investors, the true purpose of the Transactions was to fend off Icahn by diluting his interest and increasing friendly-director Rachesky's interest. Also

unbeknownst to public investors was the fact that the Transactions were part of a pre-arranged plan that was *devised* by Lionsgate's management and Board. The concealment and misrepresentation of these facts served as the cornerstone of the SEC Investigation and Order.

52. On August 2, 2010, Lionsgate filed a Schedule 14D-9 with the SEC, which it later amended over twenty times. As Annex A of the Order recites, and Lionsgate has admitted, those filings failed to include the Transactions in their description of recent securities transactions involving directors, nor did they disclose "any of the required information" about the Transactions, including the nature, price, and purpose of the Transactions, and Rachesky's involvement.

53. On July 28, 2010, prior to the Lionsgate's filing of its Schedule 14D-9, the NYSE inquired with the Company as to whether the Transactions may have violated Section 312.03(b) of the NYSE Listed Company Manual ("Section 312.03(b)"). As the Order indicates:

> Section 312.03(b) requires a company to obtain shareholder approval prior to the issuance of common stock and securities convertible into common stock to a director or to any company in which the director may have a substantial interest when the number of shares to be issued exceeds one percent of the shares of stock outstanding before the issuance.

54. Notwithstanding the fact that the Transactions involved Rachesky and placed in his hands more than 16 million shares of common stock, Lionsgate denied the application of Section 312.03(b) and contended that prior shareholder approval was not required. Yet, the Company agreed to publicly disclose additional information regarding the Transactions.

55. On September 8, 2010, in response to the NYSE inquiry, Lionsgate filed an amended Schedule 14D-9 with the SEC, in which it falsely represented that the Transactions were "not part of a pre-arranged series of transactions to issue shares to [Rachesky]." Yet, Lionsgate admittedly continued to fail to disclose material information regarding the Transactions.

56. On December 14, 2010, the Company's shareholders elected management's slate of directors and soundly rejected the slate of directors endorsed by Icahn. For example, the margin

of defeat for one of the five directors proposed by Icahn — who, if elected, would have occupied one of the twelve Board seats — was approximately 16 million shares. Not surprisingly, the number of shares Rachesky had converted the new notes into totaled approximately 16 million shares, illustrating the Transactions' success as to their true purpose.[3]

57.     Subsequently, by agreement entered into as of October 30, 2012, Burns extended his employment with Lionsgate through October 2017. Likewise, by agreement entered into as of May 30, 2013, Feltheimer extended his employment with Lionsgate through May 2018.

## V.   DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

58.     During the Class Period, Defendants made materially false and misleading statements and/or omitted material information concerning, among other things, Lionsgate's exposure to material litigation and regulatory risks as a result of the Transactions. Defendants failed to disclose — even when confronted by analysts — that the SEC was investigating them for attempting to cover up the true purpose of the Transactions and the extent to which the Transactions had been pre-arranged. Defendants' materially false and misleading statements and/or omitted material information created the false impression to the investing public that the Transactions were entirely legitimate and not subject to scrutiny and material sanctions by the SEC. As detailed herein, Defendants' false and misleading statements were made in, and material information was omitted from, Lionsgate's filings with the SEC and conference calls with investors and analysts.

---

[3] In August 2011, Rachesky acquired approximately 11 million shares of common stock from Icahn at $7.00 per share in connection with a settlement between Lionsgate and Rachesky, on one hand, and Icahn, on the other, pursuant to which Icahn agreed to sell his stake in exchange for a mutual release of claims. As a result of his acquisition, Rachesky became the largest shareholder of Lionsgate — with a 37.4% stake. The Board named Rachesky Co-Chairman (with Feltheimer) in September 2011. Rachesky became sole Chairman of the Board in February 2012.

A.     **Third Quarter Fiscal 2013 Results**

59.     The Class Period begins on February 11, 2013.  On that date, Lionsgate filed its Form 10-Q for the third quarter of fiscal year 2013 (i.e., the three-month period ended December 31, 2012), signed by Keegan (the "3Q13 Form 10-Q").[4]  The 3Q13 Form 10-Q included the following boilerplate language regarding the "claims and legal proceedings" in which the Company was purportedly then involved:

> From time to time, the Company is involved in certain claims and legal proceedings arising in the normal course of business.  While the resolution of these matters cannot be predicted with certainty, ***the Company does not believe, based on current knowledge, that the outcome of any currently pending claims or legal proceedings in which the Company is currently involved will have a material adverse effect on the Company's financial statements.***
>
> . . . .
>
> From time to time, the Company is involved in certain claims and legal proceedings arising in the normal course of business.  While the resolution of these matters cannot be predicted with certainty, ***we do not believe, based on current knowledge, that the outcome of any currently pending legal proceedings in which the Company is currently involved will have a material adverse effect on the Company's consolidated financial position, results of operations or cash flow.***

(Emphases added).  These representations were made in Note 14 ("Contingencies") of the Company's Unaudited Condensed Consolidated Financial Statements and Part II, Item 1 ("Legal Proceedings"), respectively, of the 3Q13 Form 10-Q.

60.     Defendants' statements set forth in ¶ 59 above were false and misleading and/or omitted material information when made because the following true facts were known by Defendants, but concealed from the investing public, during the Class Period:

    a.     Defendants were under investigation by the SEC for misrepresenting the true purpose of the Transactions and failing to disclose material information about them, such as

---

[4] During the Class Period, and at all relevant times, Lionsgate's fiscal year began April 1 and ended March 31 of the following calendar year.

the fact that the Transactions were a pre-arranged attempt to place a significant amount of shares of stock in the hands of a friendly director on the Board;

      b.    As a result of the SEC Investigation, it was reasonably possible that Lionsgate would be charged by the SEC or was, or could or would be, subject to other proceedings associated with the SEC's Investigation or investigations by other authorities and shareholders;

      c.    There was a reasonable possibility that Lionsgate would be forced to admit wrongdoing and/or otherwise incur material financial penalties or reputational harm as a result of impending fines and penalties related to the SEC Investigation or other proceedings concerning the Transactions;

      d.    Defendants purposefully omitted material information related to the Transactions in order to conceal the truth — that their actions were taken to protect and enhance their personal interests in the Company;

      e.    In failing to disclose material information about the SEC Investigation and related risks, Defendants were violating SEC regulations and generally accepted accounting principles ("GAAP"); and

      f.    As a result of the foregoing, Defendants' statements regarding the Company's financial condition, corporate governance, and operations were false and misleading when made.

### B.    Fourth Quarter and Full Year Fiscal 2013 Results

61.    On May 30, 2013, Lionsgate filed its Form 10-K for fiscal year 2013 (i.e., the 12-month period ended March 31, 2013), signed by Keegan, as well as Feltheimer, Burns, and other members of the Board (the "2013 Form 10-K"). The 2013 Form 10-K, which also contained financial results for the fourth quarter of fiscal year 2013 (i.e., the three-month period ended March

31, 2013), included the following boilerplate language regarding the "claims and legal proceedings" in which the Company was purportedly then involved:

> From time to time, the Company is involved in certain claims and legal proceedings arising in the normal course of business.  While the resolution of these matters cannot be predicted with certainty, ***we do not believe, based on current knowledge, that the outcome of any currently pending legal proceedings in which the Company is currently involved will have a material adverse effect on the Company's consolidated financial position, results of operations or cash flows.***
>
> . . . .
>
> From time to time, the Company is involved in certain claims and legal proceedings arising in the normal course of business.  While the resolution of these matters cannot be predicted with certainty, ***the Company does not believe, based on current knowledge, that the outcome of any currently pending claims or legal proceedings in which the Company is currently involved will have a material adverse effect on the Company's financial statements.***

(Emphases added).   These representations were made in Note 18 ("Commitments and Contingencies") of the Company's Unaudited Condensed Consolidated Financial Statements and Part II, Item 3 ("Legal Proceedings"), respectively, of the 2013 Form 10-K.

62.   The statements set forth in ¶ 61 were false and misleading and/or omitted material information when made for the reasons set forth in ¶ 60.

**C.   First Quarter Fiscal 2014 Results**

63.   On August 8, 2013, Lionsgate filed its Form 10-Q for the first quarter of fiscal year 2014 (i.e., the three-month period ended June 30, 2013), signed by Keegan (the "1Q14 Form 10-Q").  The 1Q14 Form 10-Q included the following boilerplate language regarding the "claims and legal proceedings" in which the Company was purportedly then involved:

> From time to time, the Company is involved in certain claims and legal proceedings arising in the normal course of business.  While the resolution of these matters cannot be predicted with certainty, ***the Company does not believe, based on current knowledge, that the outcome of any currently pending claims or legal proceedings in which the Company is currently involved will have a material adverse effect on the Company's financial statements.***

. . . .

> From time to time, the Company is involved in certain claims and legal proceedings arising in the normal course of business.  While the resolution of these matters cannot be predicted with certainty, *we do not believe, based on current knowledge, that the outcome of any currently pending legal proceedings in which the Company is currently involved will have a material adverse effect on the Company's consolidated financial position, results of operations or cash flow.*

(Emphases added).   These representations were made in Note 14 ("Contingencies") of the Company's Unaudited Condensed Consolidated Financial Statements and Part II, Item 1 ("Legal Proceedings"), respectively, of the 1Q14 Form 10-Q.

64.     The statements set forth in ¶ 63 were false and misleading and/or omitted material information when made for the reasons set forth in ¶ 60.

**D.     Second Quarter Fiscal 2014 Results**

65.     On November 8, 2013, Lionsgate filed its Form 10-Q for the second quarter of fiscal year 2014 (i.e., the three-month period ended September 30, 2013), signed by Barge (the "2Q14 Form 10-Q").  The 2Q14 Form 10-Q included the following boilerplate language regarding the "claims and legal proceedings" in which the Company was purportedly then involved:

> From time to time, the Company is involved in certain claims and legal proceedings arising in the normal course of business.  While the resolution of these matters cannot be predicted with certainty, *the Company does not believe, based on current knowledge, that the outcome of any currently pending claims or legal proceedings in which the Company is currently involved will have a material adverse effect on the Company's financial statements.*

> . . . .

> From time to time, the Company is involved in certain claims and legal proceedings arising in the normal course of business.  While the resolution of these matters cannot be predicted with certainty, *we do not believe, based on current knowledge, that the outcome of any currently pending legal proceedings in which the*

> ***Company is currently involved will have a material adverse effect on the Company's consolidated financial position, results of operations or cash flow.***

(Emphases added).   These representations were made in Note 14 ("Contingencies") of the Company's Unaudited Condensed Consolidated Financial Statements and Part II, Item 1 ("Legal Proceedings"), respectively, of the 2Q14 Form 10-Q.

66.     The statements set forth in ¶ 65 were false and misleading and/or omitted material information when made for the reasons set forth in ¶ 60.

### E.     Third Quarter Fiscal 2013 Results

67.     Finally, on February 6, 2014, Lionsgate filed its Form 10-Q for the third quarter of fiscal year 2014 (i.e., the three-month period ended December 31, 2013), signed by Barge (the "3Q14 Form 10-Q").   The 3Q14 Form 10-Q included the following boilerplate language regarding the "claims and legal proceedings" in which the Company was purportedly then involved:

> From time to time, the Company is involved in certain claims and legal proceedings arising in the normal course of business.   While the resolution of these matters cannot be predicted with certainty, ***the Company does not believe, based on current knowledge, that the outcome of any currently pending claims or legal proceedings in which the Company is currently involved will have a material adverse effect on the Company's financial statements.***
>
> . . . .
>
> From time to time, the Company is involved in certain claims and legal proceedings arising in the normal course of business.   While the resolution of these matters cannot be predicted with certainty, ***we do not believe, based on current knowledge, that the outcome of any currently pending legal proceedings in which the Company is currently involved will have a material adverse effect on the Company's consolidated financial position, results of operations or cash flow.***

(Emphases added).   These representations were made in Note 14 ("Contingencies") of the Company's Unaudited Condensed Consolidated Financial Statements and Part II, Item 1 ("Legal Proceedings"), respectively, of the 3Q14 Form 10-Q.

68.     The 3Q14 Form 10-Q also reported that total general and administrative expenses were $65.6 million for the quarter (or 7.8% of revenue), representing an increase of $18.7 million as compared to the same quarter of the previous year.  As the 3Q14 Form 10-Q represented: "[g]eneral and administrative expenses increased by $18.7 million primarily due to increases in shared services and corporate expenses, share-based compensation."

69.     The following day, on February 7, 2014, the Company hosted a conference call to discuss its third quarter fiscal 2013 financial performance.  During the call, Defendants acknowledged that a legal proceeding had been underway throughout the Class Period, but failed to disclose material information about the SEC Investigation.  When the question-and-answer session opened, an analyst from Evercore Partners Inc. sought to get more information on an explanation for the dramatic increase in general and administrative expenses during the quarter, resulting in the following excerpted exchange with CFO Barge:

> **Alan S. Gould - Evercore Partners Inc., Research Division:**  [C]orporate expense was much higher than I had expected.  ***Was there anything unusual in it this quarter?***  Also, I thought the stock comp might have ticked down just to reflect the mark-to-market and the stock price being down in the quarter.
>
> **James W. Barge - CFO:**  Sure.  On the stock compensation, recognize that even though there was a small decline in the current quarter of the share price, the year over year comp we had significant increase in share appreciation, from a $16 share base a year ago to over $31 at the end of the quarter.  That's what's driving the year over year increase in share appreciation.
>
> When you look at G&A cost in total, of course, that share appreciation is helping drive some of the increase in the G&A line, or the corporate expenses.  In addition to that, the growth was affected by the impact of, and the timing of, various accruals.  ***That also included an accrual related to an anticipated settlement of a legal matter that goes back several years.***
>
> What I would say is for the full year, if you exclude the effect of share price appreciation and the one-time legal accrual, I would expect FY'14 G&A cost to be up approximately 3%.

(Emphases added).

70.     Not satisfied with Barge's response, the analyst pressed for more information on the size of the "one-time legal accrual," prompting the following exchange:

> **Alan S. Gould - Evercore Partners Inc., Research Division:** *How big was that accrual, could you tell us?* Because the corporate expense before stock comp was $33 million versus $18 million a year ago. Was that accrual like $10 million to $15 million?
>
> **James W. Barge - CFO:** *Well, listen, certainly for obvious business reasons we are not going to break that amount out before final settlement. What I can tell you is that we do not expect any further accrual on this matter.*

(Emphases added).

71.     The statements set forth in ¶¶ 67-70 were false and misleading and/or omitted material information when made for the reasons set forth in ¶ 60.

## VI.   THE SEC INVESTIGATION AND ORDER ARE PUBLICLY DISCLOSED AND THE TRUTH IS REVEALED

72.     On March 13, 2014, nearly four years after the Transactions occurred, Lionsgate filed a Form 8-K in which it disclosed *for the first time* that the SEC had investigated the Company's failure to disclose material facts regarding the Transactions, and that the charge accrued in the fiscal 2014 third quarter was in connection with the SEC Investigation. The March 13, 2014 Form 8-K stated, in pertinent part, as follows:

> [Lionsgate] Entertainment Corp. (the "Company") has entered into an administrative order with the United States Securities and Exchange Commission (the "SEC") relating to transactions that the Company announced on July 20, 2010. The administrative order filed today fully resolves the SEC's investigation into these transactions. The administrative order reflecting the settlement is available at http://www.sec.gov/litigation/admin/2014/34-71717.pdf.
>
> Under the settlement, the Company has admitted to certain disclosure violations and has agreed to pay $7.5 million in penalties. This full amount was previously recorded as a charge to general and administrative expenses by the Company in the third quarter of 2014.

73.     Also on March 13, 2014, the SEC issued its own account of the events, announcing in a press release that it charged Lionsgate "with failing to fully and accurately disclose to investors

a key aspect of its effort to thwart a hostile takeover bid," and that the Company admitted wrongdoing to settle the charges.  Specifically, in accordance with the SEC's Order, Lionsgate agreed to pay $7.5 million and admit wrongdoing to charges brought under Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 promulgated thereunder, and Section 14(d) of the Exchange Act and Rule 14d-9 promulgated thereunder.  As the SEC indicated in its March 13, 2014 press release:

> [Lionsgate] failed to reveal that [the Transactions were] part of a defensive strategy to solidify incumbent management's control, instead stating in SEC filings that the transactions were part of a previously announced plan to reduce debt.  In fact, the company had made no such prior announcement.  [Lionsgate] also represented that the transactions were not "prearranged" with the management-friendly director, and failed to disclose the extent to which it planned and enabled the transactions with the expectation that the director would get the shares.

74.     Lionsgate also admitted to the facts set forth in Annex A of the Order.  These facts revealed that, despite Defendants' Class Period statements that claimed otherwise, ***the Transactions were conducted primarily for the purpose of defeating Icahn's takeover attempts***.  Commenting on the matter, Andrew J. Ceresney, director of the SEC's Division of Enforcement, stated:  "***Lionsgate withheld material information just as its shareholders were faced with a critical decision about the future of the company***."

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

75.     As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  By virtue of their receipt of information reflecting the true facts regarding the Company, and/or their control over

and involvement in Lionsgate's allegedly materially misleading misstatements and omissions, Defendants were active and culpable participants in the fraudulent scheme alleged herein.

76.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

77.     As detailed below, there exist numerous additional facts showing that Defendants' false statements were made with scienter.

A.      **Defendants Publicly Acknowledged During the Class Period that a "Legal Proceeding" Went "[B]ack [S]everal [Y]ears"**

78.     As set forth in ¶¶ 69-70, Defendants publicly acknowledged that a legal proceeding was underway during the Class Period, but failed to disclose and/or misrepresented material information about it.  Specifically, during the February 7, 2014 earnings conference call with investors and analysts, Defendant Barge represented that the Company's quarterly expenses "included an accrual related to an anticipated settlement of a legal matter that goes back several years," but refused "to break that amount out before final settlement" and did not provide any further detail regarding the "legal matter."  These omissions further evidence that Defendants acted with scienter.

79.      Indeed, the SEC's Enforcement Manual, dated October 9, 2013, describes the process associated with initiating, investigating, prosecuting, and resolving an SEC enforcement case as extensive, complicated, and time-consuming.  Typically, the process closely involves the alleged perpetrator of the misconduct — the very target of the investigation — which may be requested to provide relevant documents and information, including testimony, to the SEC.  An

informal investigation is one of several avenues SEC staff can take to gather documents, data, and other information at the beginning of an inquiry.  Informal investigations allow the SEC staff to request the voluntary production of documents and seek voluntary interviews and testimony.  Given the steps associated with the SEC enforcement process, and the length of time between the planning, consummation, and disclosure of the Transactions (in 2010) and the resolution of the SEC Investigation (in 2014), the SEC Investigation was underway and known to Defendants from the inception of the Class Period.  In fact, because the SEC did not institute an administrative proceeding until it settled the charges, the SEC presumably conducted only informal discovery during the Class Period — to which Defendants must have voluntarily submitted.  Yet, despite the nature and severity of their misconduct and the importance of the SEC Investigation to the Company and investors, Defendants failed to disclose and affirmatively concealed the SEC Investigation.

### B.    The Individual Defendants Signed Statements Certifying that They Were Responsible for Lionsgate's Financial Statements

80.    During the Class Period, the Company's Forms 10-Q and 10-K (referenced herein) included false and misleading certifications, completed pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), signed by Feltheimer, Keegan and Barge.  Specifically, Feltheimer and Keegan signed certifications included in the 3Q13 Form 10-Q, the 2013 Form 10-K, and the 1Q14 Form 10-Q, while Feltheimer and Barge signed the certifications included in the 2Q14 Form 10-Q and the 3Q14 Form 10-Q.

81.    In these Forms 10-Q and 10-K, these executives variously represented, among other things, that they had reviewed the respective quarterly or annual report for which they supplied the certification, and, further, that:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made,

in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

82.     These executives also variously represented in their certifications that they were "responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting" and had, among other things:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

83.     These representations were false and misleading, and omitted to state material facts, in the absence of disclosure concerning the existence of the SEC Investigation and facts regarding Lionsgate's exposure to loss.

84.     Furthermore, Lionsgate's disclosure controls and procedures, and internal controls over financial reporting, were not effective, because Defendants had failed to disclose material facts, as alleged herein.

**C.    Defendants Exhibited a Pattern of Failing to Disclose Material Information About the Transactions and Their Consequences**

85.    Before and during the Class Period, Defendants consistently failed to disclose material information to the investing public.  Notably, as described in ¶¶ 72-74, Defendants never revealed the true purpose of the Transactions or the lengths to which they went to stave off Icahn's acquisition overtures.  Defendants' public silence continued for nearly four years — a period that includes the entire Class Period — although they were under scrutiny by the NYSE and under investigation by the SEC.  Additionally, throughout the SEC Investigation, Defendants knowingly and/or recklessly failed to disclose the material risks that the Company and its shareholders faced by virtue of this misconduct.  Defendants' history of concealing material information about the SEC Investigation, as detailed herein, further supports an inference of scienter.

**1.    Defendants Violated Numerous SEC Regulations in Failing to Disclose Material Information About the SEC Investigation and Related Risks**

86.    SEC rules and regulations govern the preparation and content of disclosures made by public companies in SEC filings.  In failing to disclose material information about the SEC Investigation and related risks, Defendants violated these rules and regulations.

87.    SEC Regulation S-K requires that every Form 10-Q and Form 10-K filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. § 229.303. The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

88.     Item 303(a)(3) of Regulation S-K requires that the MD&A section of a company's periodic filings with the SEC (i.e., Forms 10-Q and 10-K), among other things:

(i) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected.  In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

(ii) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

89.     Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.

90.     Defendants violated the affirmative disclosure duties imposed by Item 303 by failing to disclose, among other things, the following material information in Lionsgate's Forms 10-Q and 10-K filed during the Class Period:  (i) that the SEC and other regulatory and/or legal authorities were conducting an investigation of the Company in connection with the negotiation, effectuation, and disclosure of the Transactions; and (ii) that Lionsgate was exposed to the risk or uncertainty that such investigation(s) was reasonably likely to result in a significant fine, financial penalty, or reputational harm, and/or have an adverse impact on revenues and continuing operations.  These concealed facts were required to be disclosed because they were, among other things:  (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future

financial condition;" (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations;" and/or (iii) "unusual or infrequent events or transactions or . . . significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations."

91.      Item 503(c) of Regulation S-K, 17 C.F.R. § 229.503(c), which governs disclosure of risk factors, requires an issuer to "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the [securities] speculative or risky."  Specifically, Item 503(c) requires the issuer to "[e]xplain how the risk affects the issuer or the securities" and to "[s]et forth each risk factor under a subcaption that adequately describes the risk."  Additionally, the SEC further instructs issuers, in Item 1A to Part I of the General Instructions governing the preparation of an issuer's annual report on Form 10-K, to "[s]et forth, under the caption 'Risk Factors,' where appropriate, the risk factors described in Item 503(c) of Regulation S-K," codified at 17 C.F.R. § 229.503(c).  Item 1A to Part II of the General Instructions governing the preparation of an issuer's quarterly report on Form 10-Q, similarly requires the issuer to "[s]et forth any material changes from risk factors as previously disclosed in the registrant's Form 10-K (§249.310) in response to Item 1A. to Part [I] of Form 10-K."

92.      In the 3Q13 Form 10-Q, filed at the start of the Class Period, Lionsgate incorporated by reference the risk factors set forth in the previous Form 10-K, which had been filed on May 30, 2012, before the Class Period began.  In the 3Q13 Form 10-Q, the Company updated the risk factors in discrete ways and reported that no other material changes to those factors had occurred during the respective reporting periods.  Similarly, in the other Forms 10-Q filed during the Class Period, the Company incorporated by reference the risk factors set forth in the 2013 Form 10-K,

filed on May 30, 2013.  In those Forms 10-Q, the Company again updated the risk factors in

discrete ways and reported that no other material changes to those factors had occurred during the

respective reporting periods.

93.     Item 103 of Regulation S-K, 17 C.F.R. § 229.103, governing the disclosure of legal

proceedings, requires an issuer to disclose in its periodic SEC filings (i.e., Forms 10-Q and 10-K)

"proceedings known to be contemplated by governmental authorities," as follows:

> Describe briefly any material pending legal proceedings, other than ordinary
> routine litigation incidental to the business, to which the registrant or any of its
> subsidiaries is a party or of which any of their property is the subject.  Include the
> name of the court or agency in which the proceedings are pending, the date
> instituted, the principal parties thereto, a description of the factual basis alleged to
> underlie the proceeding and the relief sought.  Include similar information as to any
> such proceedings known to be contemplated by governmental authorities.

94.     Finally, the SEC considers the disclosure of loss contingencies of such importance

to an informed investment decision that it issued Article 10-01 of Regulation S-X, 17 C.F.R.

§ 210.10-01, which provides that disclosures in interim period financial statements may be

abbreviated and need not duplicate the disclosure contained in the most recent audited financial

statements, *except that* "where material contingencies exist, disclosure of such matters shall be

provided even though a significant change since year end may not have occurred."

95.     Lionsgate failed to disclose the SEC charges, investigation, and contemplated

proceedings until March 13, 2014 — after they were resolved, and one month after the Company

had accrued (but not specifically identified) a charge for the estimable loss associated with such

matters.  Moreover, none of the Class Period Forms 10-Q or 10-K disclosed the risks associated

with the SEC Investigation and any potential harm resulting therefrom, including penalties, fines,

injunctive prohibitions, or reputational injury.  Indeed, the Company falsely denied that any legal

proceedings or claims would have a material adverse effect on it.  The failure to disclose this

material information, therefore, violated the disclosure obligations imposed by Items 303, 503,

and 103, as well as Article 10-01.  Defendants falsely led investors to believe that the Company was not exposed to any risks other than those already disclosed.

**2.      Defendants Violated Generally Accepted Accounting Principles in
Failing to Disclose the SEC Investigation and Related Risks**

96.      GAAP are principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. Compliance with GAAP is a fundamental obligation of publicly traded companies.  As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

97.      Accounting Standard Codification ("ASC") Topic 450, *Contingencies*, GAAP requires the accrual of a loss contingency by a charge against income when:  (i) information available prior to issuance of the financial statements indicates that it is probable (i.e., likely) that a contingent liability or potential loss has been incurred; and (ii) the amount of loss can be reasonably estimated.  In situations where a contingent liability or a potential loss does not satisfy both of these conditions, ASC Topic 450 requires that "disclosure of the contingency shall be made when there is at least a reasonable possibility [i.e., a greater than slight chance] that a loss or an additional loss may have been incurred."  ASC Topic 450 defines a contingency as "[a]n existing condition, situation, or set of circumstances involving uncertainty as to possible gain (gain contingency) or loss (loss contingency) to an entity that will ultimately be resolved when one or more future events occur or fail to occur."  Pending or threatened litigation is a source of significant potential liability for a public company and is an example of a loss contingency.

98.      Lionsgate's Class Period SEC filings failed to comply with GAAP and the provisions of ASC Topic 450.  First, Defendants knew or recklessly disregarded that the SEC was

conducting an investigation of Lionsgate relative to the negotiation, effectuation, and disclosure of the Transactions, and that the Company faced significant financial or other exposure as a result. Instead, Defendants failed to disclose — and even falsely denied — the existence and pendency of the material investigation.  Second, even when the Company could estimate the loss, having a charge associated with the SEC investigation (accounted for in "general and administrative expenses"), the Company did not specifically identify the charge in the 3Q14 Form 10-Q. Defendants did, however, falsely deny that any legal proceedings or claims would have a material adverse effect on the Company.  By failing to disclose material information regarding the nature of the charge, Defendants deprived investors of the ability to fully anticipate, appreciate, and understand such a loss.

## VIII.   THE SEC FINE, AND THE PROSPECT OF MORE SEVERE PENALTIES, WERE MATERIAL TO THE COMPANY

99.    The 3Q14 Form 10-Q disclosed that total general and administrative expenses were $65.6 million for the quarter (or 7.8% of consolidated revenue of $839.9 million), representing an *increase* of $18.7 million (or 39.9%) as compared to the same quarter of the previous year (when such expenses were $46.9 million).  The 3Q14 Form 10-Q, however, represented that the $18.7 million increase came "primarily" from "increases in shared services and corporate expenses, and share-based compensation."  Yet, as revealed on March 13, 2014, the $7.5 million fine accounted for 40% of the increase and 11.4% of total general and administrative expenses (or 14% of the expenses, if $12.1 million in share-based compensation expenses were excluded).  The SEC fine was unquestionably material to the Company's financial condition, business and operations.

100.    Further, during the Class Period (and even before), Lionsgate faced the prospect that the SEC could assess a *higher* fine in an *earlier* quarter — i.e., in or after the second quarter

of fiscal year 2011 (ending September 30, 2010), when the Transactions were effectuated.  This risk was not known to public investors, and reinforces the materiality of the Company's potential and actual loss associated with the Transactions — and, by extension, the nondisclosure of the SEC Investigation (and potentially other matters).

101.     Finally, the SEC required payment of the $7.5 million fine within ten business days of entry of the Order.  As reported in the 3Q14 Form 10-Q, Lionsgate had cash and cash equivalents of approximately $75.4 million as of December 31, 2013.  The $7.5 million fine represents *nearly 10%* of such cash and cash equivalents, payable in only a matter of days.  The prospect of making such a payment in an accelerated time frame, as the SEC requires, underscores the importance of the fine to Lionsgate's business and operations — and further reinforces the importance of disclosing the SEC Investigation and the risks, uncertainties, and potential and/or actual losses associated therewith.

## IX.    LOSS CAUSATION

102.     Throughout the Class Period, the trading price of Lionsgate's common stock was artificially inflated as a result of the foregoing materially incomplete, false and misleading statements.  As detailed above, Defendants failed to disclose numerous material facts, including, but not limited to the SEC Investigation and truth concerning the Company's regulatory and financial exposure as a result of the Transactions.

103.     These materially false and misleading statements, individually and collectively, concealed securities law and regulatory violations at Lionsgate, resulting in the stock being artificially inflated until, as indicated herein, the relevant truth about the violations was revealed. While each of these misrepresentations was independently fraudulent, they all were motivated by Defendants' desire to entrench themselves at the Company while artificially inflating Lionsgate's stock price and to provide, among other things, the false assurance that Lionsgate was in

compliance with NYSE rules, SEC regulations, and securities laws.  These materially false and misleading statements and omissions, among others, had the intended effect of preventing the market from learning the full truth and keeping the Company's stock price artificially inflated throughout the Class Period.  Indeed, Defendants' materially false and misleading statements had the intended effect and caused, or were a substantial contributing cause of Lionsgate's stock trading at artificially inflated levels, reaching as high as $37.81 per share[5] during the Class Period.

104.    A true picture of Lionsgate's regulatory circumstances was revealed on March 13, 2014, when it was announced that Lionsgate settled the SEC Investigation by agreeing to pay $7.5 million in fines, and to acknowledge and consent to the Order.

105.    Specifically, at approximately noon Eastern on March 13, 2014, the SEC issued a press release announcing that it had charged Lionsgate with "failing to fully and accurately disclose to investors a key aspect of its effort to thwart a hostile takeover bid.   Lionsgate agreed to pay $7.5 million and admit wrongdoing to settle the SEC's charges."[6]  At the same time, the SEC made available the Order disclosing how "Lionsgate's management participated in a set of extraordinary corporate transactions in 2010 that put millions of newly issued company shares in the hands of a management-friendly director."[7]

106.    On the same day, Lionsgate filed a Form 8-K in which it also disclosed for the first time that the SEC had investigated the Company's failure to disclose material facts regarding the

---

[5] Intra-day trading price for Lions Gate stock on September 10, 2013.

[6] Press Release, SEC, *SEC Charges Lions Gate With Disclosure Failures While Preventing Hostile Takeover: Company Admits Wrongdoing to Settle SEC Charges* (Mar. 13, 2014), available at http://www.sec.gov/servlet/Satellite/News/PressRelease/Detail/PressRelease/1370541123111 (last visited Dec. 10, 2014).

[7] *Id.*

Transactions, and that the charge accrued in the fiscal 2014 third quarter was in connection with the investigation.

107.    When these surprising revelations were made on March 13, 2014, they served as an indication to the market that Defendants' prior Class Period statements were materially false and misleading.

108.    As a result of these disclosures regarding the SEC Settlement and Order, the closing price of Lionsgate's stock dropped in a statistically significant manner from $33.26 per share on March 12, 2014 to $32.20 per share on March 13, 2014, a decline of approximately 3.2%.  This decrease was a result of the artificial inflation caused by Defendants' materially false and misleading statements being removed from the stock price.

109.    The Company's stock price, however, continued to suffer significant declines in value over the next few trading days as the market continued to digest adverse information regarding the Company's business practices and operations, and third-party observers closely scrutinized the Company's risks and governance practices.  On March 14, 2014, *The New Post* published an article entitled "Lionsgate Violated SEC Rules in Icahn Bid; Carl May Sue," which stated in relevant part:

> Perhaps the next Lionsgate movie will be called "Carl Icahn's Revenge."
>
> Icahn is still upset his former protégé Mark Rachesky screwed him out of $1 billion at Lionsgate Entertainment, a source familiar with Icahn's thinking told The Post.
>
> And since Rachesky's Lion's Gate, the studio behind the "The Hunger Games," admitted Thursday it violated securities regulations in 2010 when thwarting Icahn's hostile takeover, sources believe Icahn will likely soon sue Rachesky.

110.    Moreover, the timing and uncertainty of the fraud revelations impacted the market's ability to fully digest the foregoing disclosures.  For example, not until March 17, 2014, did certain analysts that closely follow the Company revise their fourth quarter fiscal year 2014 forecasts to

reflect the $7.5 million SEC Settlement charge.[8]   Consequently, the price of Lionsgate stock continued to experience statistically significant drops until the end of trading on March 17, 2014.

111.   As a result of the foregoing disclosures to the market, the closing price of Lionsgate's stock dropped in a statistically significant manner from $33.26 to $30.33 over three trading days, a decline of over 9%, on heavy trading volume.   This decrease was a result of a portion of the artificial inflation caused by Defendants' materially false and misleading statements being removed from the stock price.

112.   The market's negative reaction on March 13, March 14, and March 17, 2014, to the SEC Settlement revelations is demonstrated in the following stock chart:



---

[8] Marla Backer, *Divergent: Strong Advance Ticket Sales*, Ascendiant Capital Markets, LLC (Mar. 17, 2014) (noting "we have revised our 4Q FY14 EPS forecast to reflect the $7.5M settlement charge").

113.    The timing and magnitude of Lionsgate's March 13-17, 2014 stock price decline negates any inference that the losses suffered by Plaintiffs and the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  This point is evidenced by the charts below, which demonstrate the clear divergence of Lionsgate's stock price from its peer index[9] as the truth became known to the market:



---

[9] Lions Gate compares itself to the NYSE Composite Index and the S&P Movies & Entertainment Index in its own filings.  *See* Lions Gate, Annual Reports (Form 10-K) (May 30, 2013 & May 29, 2014).



## X.   APPLICABILITY OF PRESUMPTION OF RELIANCE

114.   Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact which there was a duty to disclose.

115.   In the alternative, Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory, because Lionsgate common stock traded in an efficient market during the Class Period, as follows:

a.   Lionsgate's common stock was actively traded on the NYSE, an informationally efficient market, throughout the Class Period.

b.   Lionsgate's common stock traded at high weekly volumes during the Class Period.

c.   As a regulated issuer, Lionsgate filed periodic public reports with the SEC.

d.   Lionsgate regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press

40

releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

e.     The market reacted promptly to public information disseminated by Lionsgate.

f.     Lionsgate securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms.  Each of these reports was publicly available and entered the public marketplace.

g.     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Lionsgate's common stock.

116.     Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased shares of Lionsgate's common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

## XI.     CONTROL PERSON ALLEGATIONS / GROUP PLEADING

117.     By virtue of the Individual Defendants' positions within the Company, they had access to undisclosed adverse information about Lionsgate, its business, operations, operational trends, finances, and present and future business prospects.  The Individual Defendants would ascertain such information through Lionsgate's internal corporate documents, conversations, and connections with other corporate officers, bankers, traders, risk officers, marketing experts, employees, attendance at management and Board meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as Lionsgate officers and/or directors.

118.    It is appropriate to treat the Individual Defendants collectively as a group for pleading purposes and to presume that the materially false, misleading, and incomplete information conveyed in the Company's public filings, press releases, and public statements, as alleged herein, was the result of the collective actions of the Individual Defendants identified above.  The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company, its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

119.    The Individual Defendants were involved in drafting, producing, reviewing, approving, and/or disseminating the materially false and misleading statements and information alleged herein, were aware of or recklessly disregarded the fact that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

120.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, risk, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate

information.  The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

121.    The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  The Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein.

122.    Each of the Individual Defendants is liable as a participant in a scheme, plan, and course of conduct that operated as a fraud and deceit on Class Period purchasers of the Company's securities.

## XII.    INAPPLICABILITY OF SAFE HARBOR

123.    As alleged herein, Defendants acted with scienter because at the time that they issued public documents and other statements in Lionsgate's name they knew, or with extreme recklessness disregarded the fact, that such statements were materially false and misleading or omitted material facts.  Moreover, Defendants knew such documents and statements would be issued or disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

124.    As set forth in detail throughout this Complaint, Defendants, by virtue of their control over, and/or receipt, of Lionsgate's materially misleading statements and their positions with the Company that made them privy to confidential proprietary information, used such information to artificially inflate Lionsgate's financial results.  Defendants were informed of,

participated in, and knew of the SEC Investigation alleged herein and understood its material effect on the present and future prospects of the Company.  With respect to non-forward-looking statements and omissions, Defendants knew and recklessly disregarded the falsity and misleading nature of that information, which they caused to be disseminated to the investing public.

125.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint.  None of the statements pleaded herein are forward-looking statements and no such statement was identified as a forward-looking statement when made.  Rather, the statements alleged herein to be materially false and misleading by affirmative misstatement and/or omissions of material fact all relate to facts and conditions existing at the time the statements were made.  Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any putative forward-looking statements.

126.   Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Lionsgate who knew that those statements were false when made.  Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading because they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## XIII.   CLASS ACTION ALLEGATIONS

127.   Plaintiffs bring this action on their own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities that, between February 11, 2013, through March 13, 2014 inclusive (the "Class Period"), purchased or otherwise acquired shares of Lionsgate's common stock, and were damaged thereby (the "Class").   Excluded from the Class are: Defendants; members of the immediate families of the Individual Defendants; Lionsgate's subsidiaries and affiliates; any person who is or was an officer or director of Lionsgate or any of Lionsgate's subsidiaries or affiliates during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

128.   The members of the Class are so numerous that joinder of all members is impracticable.   During the Class Period, Lionsgate had between approximately 135.2 million and 138 million shares of common stock outstanding and actively trading on the NYSE.   While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that the proposed Class numbers in the thousands and is geographically widely dispersed.   Record owners and other members of the Class may be identified from records maintained by Lionsgate or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

129.   Plaintiffs' claims are typical of the claims of the members of the Class.   All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

130.   Plaintiffs will fairly and adequately protect the interests of the members of the Class.   Plaintiffs have retained counsel competent and experienced in class and securities litigation.

131.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include:

a.    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.    whether the statements made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

c.    whether and to what extent the market price of Lionsgate's common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

d.    whether Defendants acted with the requisite level of scienter;

e.    whether the Individual Defendants were controlling persons of Lionsgate;

f.    whether reliance may be presumed; and

g.    whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

132.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the managements of this action as a class action.

## COUNT I

### Violation of § 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

133.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

134.     This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

135.     As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiffs and members of the Class; (ii) artificially inflate and maintain the prices of Lionsgate common stock; and (iii) cause Plaintiffs and members of the Class to purchase Lionsgate common stock at artificially inflated prices.

136.     The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

137.     As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or

in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased Lionsgate common stock during the Class Period.

138.    In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Lionsgate common stock, Plaintiffs and other members of the Class purchased Lionsgate common stock at artificially inflated prices during the Class Period.  But for the fraud, Plaintiffs and members of the Class would not have purchased Lionsgate common stock at such artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the price of Lionsgate common stock declined precipitously and Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Lionsgate common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

139.    By virtue of the foregoing, Defendants are liable to Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of § 20(a) of the Exchange Act
### Against the Individual Defendants

140.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

141.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against each of the Individual Defendants.

142.    As alleged above, Lionsgate violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase and sale of Lionsgate's common stock and by participating in a fraudulent scheme and

course of business or conduct throughout the Class Period.   This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate reckless disregard of the falsity of the Company's statements and the fraudulent nature of its scheme during the Class Period.

143.    As set forth above, the Individual Defendants were controlling persons of Lionsgate during the Class Period, due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations, including their power to control or influence the Transactions giving rise to the securities violations alleged herein, and exercised the same.

144.    By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Lionsgate, including the content of its public statements with respect to its operations, corporate governance, and compliance with regulators.

145.    These Individual Defendants acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Plaintiffs and the other members of the Class who purchased Lionsgate common stock during the Class Period.

146.    In ignorance of the false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for Lionsgate common stock, Plaintiffs and other members of the Class purchased Lionsgate common stock at an artificially inflated price during the Class Period.  But for the fraud, Plaintiffs and members of the Class would not have purchased Lionsgate common stock at artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the price of Lionsgate common stock declined precipitously and Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Lionsgate common

stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth began to be disclosed.

147.    By reason of the foregoing, the Individual Defendants are liable to Plaintiffs and the members of the Class as controlling persons of Lionsgate in violation of Section 20(a) of the Exchange Act.

## XIV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment as follows:

A.      Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiffs as class representatives, and appointing Motley Rice LLC as class counsel pursuant to Rule 23(g);

B.      Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C.      Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

D.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including but not limited to, attorney's fees and costs incurred by consulting and testifying expert witnesses; and

E.      Granting such other and further relief as the Court deems just and proper.

## XV.    JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

DATED:  December 29, 2014

*Respectfully submitted*,

**MOTLEY RICE LLC**


*s/ William H. Narwold*
William H. Narwold

One Corporate Center
20 Church Street, 17th Floor
Telephone:   (860) 882-1681
Facsimile:   (860) 882-1682
Email:         bnarwold@motleyrice.com

James M. Hughes
William S. Norton
David P. Abel
William P. Tinkler
28 Bridgeside Boulevard
Mt. Pleasant, SC  29464
Telephone:   (843) 216-9000
Facsimile:   (843) 216-9450
Emails:        jhughes@motleyrice.com
                    bnorton@motleyrice.com
                    dabel@motleyrice.com
                    wtinkler@motleyrice.com

*Lead Counsel for Lead Plaintiff KBC*


**HAGENS BERMAN SOBOL SHAPIRO LLP**
Jason A. Zweig
555 Fifth Avenue, Suite 1700
New York, NY  10017
Telephone:   (212) 752-5455
Facsimile:   (917) 210-3980
Email:         jasonz@hbsslaw.com

Peter E. Borkon
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone:   (510) 725-3000
Facsimile:   (510) 725-3001
Email:         peterb@hbsslaw.com

*Counsel for Mr. Amado Santos*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 29, 2014, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on December 29, 2014.

*s/ William H. Narwold*
William H. Narwold

MOTLEY RICE LLC
One Corporate Center
20 Church Street, 17th Floor
Telephone:   860/882-1681
Facsimile:   860/882-1682
Email:         bnarwold@motleyrice.com