**United States District Court**
**Southern District of New York**

_____

IN RE LIONS GATE ENTERTAINMENT CORP.          14-cv-5197 (JGK)
SECURITIES LITIGATION                         14-cv-5477 (JGK)


                                              <u>OPINION AND ORDER</u>


_____

**JOHN G. KOELTL, District Judge:**

This is a consolidated securities action brought on behalf
of a proposed class of shareholders of common stock of Lions
Gate Entertainment Corporation ("Lions Gate" or the "Company").
The lead plaintiff, KBC Asset Management NV, together with two
additional plaintiffs (the "plaintiffs"), filed a Second Amended
Complaint ("SAC") on April 1, 2015. The plaintiffs asserted
violations of Section 10(b) of the Securities Exchange Act of
1934, 15 U.S.C. § 78j(b) (the "Exchange Act"), and Rule 10b-5
promulgated thereunder, 17 C.F.R. § 240.10b-5, against Lions
Gate and four senior executives of the Company (the "individual
defendants"). The plaintiffs also asserted control person
liability under Section 20(a) of the Exchange Act, 15 U.S.C.
§ 78t(a), against the individual defendants.

The SAC alleges that the Company and the individual
defendants were aware of an active Securities and Exchange
Commissions ("SEC") investigation into certain corporate

transactions allegedly structured to prevent a minority investor from gaining control of the Company. The Company had allegedly misrepresented the transactions in the summer of 2010 when they occurred. Eventually, the Company settled with the SEC and agreed to pay a civil penalty of $7.5 million in March 2014. The plaintiffs allege that the failure to disclose the SEC investigation and possible settlement was a violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5.

The defendants now move to dismiss the SAC for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). This court has subject matter jurisdiction pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331. For the reasons explained below, the motion is granted.

## I.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). A complaint should not be dismissed if the plaintiff has

stated "enough facts to state a claim to relief that is
plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S.
544, 57 (2007). "A claim has facial plausibility when the
plaintiff pleads factual content that allows the court to draw
the reasonable inference that the defendant is liable for the
misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678
(2009). While factual allegations should be construed in the
light most favorable to the plaintiff, "the tenet that a court
must accept as true all of the allegations contained in a
complaint is inapplicable to legal conclusions." Id.

A claim under Section 10(b) of the Securities Exchange Act
sounds in fraud and must meet the pleading requirements of Rule
9(b) of the Federal Rules of Civil Procedure and of the Private
Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-
4(b). Rule 9(b) requires that the complaint "(1) specify the
statements that the plaintiff contends were fraudulent,
(2) identify the speaker, (3) state where and when the
statements were made, and (4) explain why the statements were
fraudulent." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d
87, 99 (2d Cir. 2007). The PSLRA similarly requires that the
complaint "specify each statement alleged to have been
misleading [and] the reason or reasons why the statement is
misleading," and it adds the requirement that "if an allegation

regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); ATSI, 493 F.3d at 99.

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002). The Court can take judicial notice of public disclosure documents that must be filed with the SEC and documents that both "bear on the adequacy" of SEC disclosures and are "public disclosure documents required by law." Kramer v. Time Warner, Inc., 937 F.2d 767, 773-74 (2d Cir. 1991); see also Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V., 89 F. Supp. 3d 602, 607-08 (S.D.N.Y. 2015); Silsby v. Icahn, 17 F. Supp. 3d 348, 353-54 (S.D.N.Y. 2014), aff'd sub nom., Lucas v. Icahn, 616 F. App'x 448 (2d Cir. 2015).

## II.

The following facts alleged in the SAC are accepted as true for purposes of the defendants' motion to dismiss.

### A.

Lions Gate is a multimedia conglomerate that produces and distributes motion pictures, television programs, and other forms of entertainment. SAC ¶¶ 2, 21.  Lions Gate's common stock is publicly traded on the New York Stock Exchange ("NYSE"). The individual defendants were all senior executives of Lions Gate during some portion of the Class Period, February 11, 2013 to March 13, 2014. SAC ¶¶ 1, 22-25.

Jon Feltheimer is the Chief Executive Officer ("CEO") and a member of the Lions Gate Board. SAC ¶ 22. He has held these positions since March 2000. He also served as Co-Chairman of the Board until February 2012. Id. James Keegan was Lions Gate's Chief Administrative Officer from April 2002 to October 2013, and Chief Financial Officer ("CFO") from September 2002 to October 2013. SAC ¶ 23. Keegan also served as a financial consultant for Lions Gate from October 1, 2013 to January 3, 2014. Id. James Barge has served as Lions Gate's CFO since October 1, 2013. SAC ¶ 24. Michael Burns is the Vice Chairman of Lions Gate and a member of the Board. He has held these positions since March 2000 and August 1999, respectively. SAC

5

¶ 25. Feltheimer and Barge signed Lions Gate's Form 10-Q for the second and third quarters of 2014. Feltheimer and Keegan signed the Form 10-Q for the third quarter of 2013 and the first quarter of 2014, as well as a Form 10-K for 2013. SAC ¶ 124.

## B.

This action concerns alleged omissions by Lions Gate and the individual defendants about the possibility of an SEC enforcement proceeding and settlement. The gist of the SAC is that Lions Gate was aware in 2012 that the SEC had begun investigating Lions Gate and Lions Gate's management for making allegedly false statements and representations when Lions Gate announced a series of transactions in 2010. These transactions constituted a defensive capitalization of Lions Gate. According to the plaintiffs, Lions Gate failed to disclose the details of the SEC Enforcement Division investigation, the possibility of an SEC enforcement proceeding, and an imminent settlement with the SEC.

According to the SAC, in 2010, the Lions Gate Board of Directors became embroiled in a power struggle with Carl Icahn, a minority shareholder in Lions Gate. Icahn began acquiring a substantial stake in Lions Gate in 2008 and 2009, and held about 18% of outstanding Lions Gate shares by February 2010. SAC ¶ 28. Icahn approached Lions Gate about appointing his own

representatives as members to the Board of Directors and threatened a proxy contest. SAC ¶ 29. In February 2010, Icahn publicly announced that he was interested in conducting a partial tender offer at $6.00 per share to increase his stake in Lions Gate to 29.9%. SAC ¶ 31. Icahn launched his tender offer on March 1, 2010. SAC ¶ 32.

According to the SAC, Lions Gate's Board adopted a shareholder rights plan, also known as a poison pill, as a defensive measure to prevent Icahn's acquisition of more than 20% of Lions Gate's outstanding shares. SAC ¶ 33. The poison pill was designed to dilute Icahn's interest in Lions Gate and prevent him from gaining control of the Lions Gate Board. On March 19, 2010, Icahn amended his tender offer, this time offering to purchase all tendered shares on the condition that he would be obligated to purchase the shares only if doing so would result in his holding at least 50.1% of all outstanding shares. SAC ¶ 34. In April 2010, Icahn increased the tender offer price per share to $7.00. SAC ¶ 35. Canadian regulators voided Lions Gate's poison pill in April 2010, and Icahn was able to increase his holdings. SAC ¶ 33. The SAC alleges that Lions Gate spurned Icahn's effort and encouraged shareholders to refuse the tender offer. By July 1, 2010, Icahn held 37.9% of the outstanding shares. SAC ¶ 36.

The SAC alleges that in response to Icahn's attempts at a hostile takeover, the Lions Gate Board began contemplating more aggressive defensive measures to dilute Icahn's interest in Lions Gate. The Lions Gate Special Committee and Board of Directors met in June 2010 to discuss a possible transaction whereby existing convertible notes held by Kornitzer Capital Management Inc. ("KCM") would be exchanged for new notes which Mark Rachesky, a Lions Gate director, would in turn purchase.[1] Rachesky was perceived as friendly to the incumbent management. SAC ¶ 37, 41.

Lions Gate and Icahn entered into a standstill agreement on July 9, 2010, to allow Lions Gate to negotiate a merger with MGM Studios. SAC ¶ 42. The standstill was scheduled to expire on July 19, 2010, just after 11:59 p.m. SAC ¶ 43. The MGM acquisition never came to fruition. SAC ¶ 48. Icahn responded by threatening to launch a tender offer for any and all shares necessary to remove the management. SAC ¶ 48.

According to the SAC, at 12:01 a.m. on July 20, 2010, the Special Committee of Lions Gate and the Lions Gate Board of

---

[1] The original convertible notes could be converted to Lions Gate common stock at the option of the noteholder at certain dates. But the convertible notes were "out of the money" because the price of conversion was higher than the market price of the stock. Ex. 1 to SAC, Order Instituting Cease-And-Desist Proceedings, Annex A ¶ 22. It would have been impractical for KCM to exercise the conversion rights while the market price was lower than the conversion price.

Directors met. SAC ¶ 50. Legal counsel for Lions Gate and Feltheimer and Burns attended both meetings. SAC ¶ 50.  The Board issued new notes to KCM that would be immediately convertible to stock. The new notes would be convertible at the market price of Lions Gate stock rather than the above-market price of the old notes, and the new notes did not include a provision featured in the old notes that restricted conversion if the conversion would result in the noteholder owning more than 4.99% of Lions Gate stock. SAC ¶ 47.

The Board also approved an amendment to the insider trading policy, shortening the period of time during which insiders could not trade in Lions Gate stock prior to a quarterly earnings announcement from 45 days to 15 days. SAC ¶ 53. KCM agreed to the note exchange in the early morning hours of July 20, 2010. SAC ¶ 54-55. Rachesky in turn purchased KCM's notes a few hours later, and then Rachesky converted the new notes into Lions Gate stock at a price of $6.20 per share. SAC ¶ 56. Rachesky's holdings increased from 19.99% to 28.9% and Icahn's holdings decreased from 37.87% to 33.5%. SAC ¶ 56.

Lions Gate filed a Form 8-K on July 20, 2010, announcing that the Company had retired debt— approximately $100 million in senior notes. SAC ¶ 57. An accompanying press release disclosed that the notes were converted into a total of 16,236,305 shares.

SAC ¶ 57. The press release also asserted that the debt conversion was part of Lions Gate's efforts to reduce its total debt. SAC ¶ 57. But the SAC alleges that Lions Gate had never before announced a debt reduction plan. SAC ¶ 58. Lions Gate went on to elect a new Board of Directors, with Rachesky serving as co-chairman of the Board and in February 2012, the sole chairman, and Lions Gate successfully staved off Icahn's attempt to wrest control away from management. SAC ¶ 63 & n.3.

## C.

Although not the basis for the alleged securities violations in this case, the SAC alleges that Lions Gate violated several securities reporting requirements by failing to disclose the connection between the KCM note exchange and the Rachesky note purchase and stock conversion.[2] SAC ¶¶ 59-62. Shareholder approval is typically required prior to a stock purchase by a director when the number of shares exceeds 1% of outstanding stocks. NYSE § 312.03(b). Rachesky originally held 19.99% of Lions Gate stock, and increased his holdings to 28.9%. SAC ¶ 56. In late July 2010, the NYSE inquired into Lions Gate's Transactions, requesting a chronology and documentation of the

---

[2] This opinion refers to the following three transactions as the "Transactions": (1) the exchange of old KCM notes to new convertible notes, (2) the sale of KCM notes to Rachesky, and (3) the conversion of those notes to shares. SAC ¶¶ 55-56.

KCM refinancing and the issuance of shares to Rachesky. SAC ¶¶
65-66. Lions Gate's outside counsel and the NYSE allegedly had
numerous discussions in September of 2010 about whether the
Transactions were separate or whether they were a "series of
related transactions" that required shareholder approval. SAC ¶
67. Lions Gate's counsel represented to regulators that the
Transactions were separate, and the NYSE informed Lions Gate
that the NYSE did not believe that Lions Gate had violated NYSE
Section 312.03(b). SAC ¶ 68.

As explained in greater detail below, the SEC issued a
series of subpoenas in 2011, requesting documents and sworn
testimony from Lions Gate representatives and counsel concerning
the Transactions and the management's disclosures leading up to
the Transactions. SAC ¶¶ 71-83. On September 17, 2010, the SEC
contacted Lions Gate's counsel, and informed Lions Gate that the
SEC Enforcement Division was "conducting an informal
investigation" into the Transactions' timeline and the Company's
disclosures. SAC ¶ 71. The SEC requested a chronology of the
Transactions as well as documents related to Lions Gate's
disclosures. Rachesky allegedly received a similar request from
the SEC on September 17, 2010. SAC ¶ 72.

On January 3, 2011, the SEC issued a formal order of
investigation that detailed the KCM and Rachesky transactions

and explained the possible securities law violations in
connection with the Transactions. SAC ¶ 73. According to the
SAC, Lions Gate may have violated Section 17(a) of the
Securities Act of 1933, 15 U.S.C. § 77q(a), and Section 10(b) of
the Exchange Act and Rule 10b-5 by making material misstatements
about the July 20 Transactions. SAC ¶ 73. There were also
possible violations of Section 14(e) of the Exchange Act and
Rule 14e-3 for untrue statements of material facts or omissions
in connection with a tender offer. SAC ¶ 73. The SEC issued a
series of subpoenas from January 28, 2011 through September 12,
2011. SAC ¶¶ 74-83.

The SAC alleges that in July 2012 the SEC Enforcement
Division provided several "Wells Notices" indicating that the
SEC Enforcement Division was considering recommending that the
SEC file a civil action against the Company and its executives,
likely Feltheimer, Keegan, and Burns, for violations of
securities laws. SAC ¶ 84. A Wells Notice informs the recipient
that the SEC Enforcement Division staff has decided to recommend
that the Commission bring an enforcement proceeding, identifies
alleged violations of securities law, and provides potential
defendants the opportunity to make a responsive submission. SAC
¶ 85. The SAC alleges that Lions Gate and the individual
defendants knew that the SEC had "developed sufficient evidence

to successfully prosecute a civil action or enforcement proceeding." SAC ¶ 85.

According to the SAC, Lions Gate's counsel met with the SEC staff in November and early December 2013, but Lions Gate remained at risk that the SEC would proceed with a case if the matter could not be resolved. SAC ¶ 89. The Board of Directors of Lions Gate met on December 17, 2013 to authorize members of management to resolve the SEC matter. SAC ¶¶ 90-91. On February 11, 2014, the SEC provided Lions Gate's outside counsel with a near-final version of the offer of settlement and the formal complaint which had been converted into a proposed order. SAC ¶¶ 92, 66.

Lions Gate signed the offer of settlement on February 14, 2014. SAC ¶ 95. On March 13, 2014, the SEC commenced administrative proceedings against Lions Gate and publicly issued the order. The SEC resolved the proceeding the same day. SAC ¶ 96. The SEC notified three individuals affiliated with Lions Gate that it did not intend to recommend an enforcement action against them. SAC ¶ 96.

On March 13, 2014, Lions Gate filed a Form 8-K, disclosing that the SEC had investigated Lions Gate in connection with its disclosures regarding the Transactions and stating that Lions Gate entered into an administrative order with the SEC that

resolved the SEC's investigation into the Transactions. SAC ¶ 116. Lions Gate agreed to pay a civil penalty of $7.5 million and admit wrongdoing under Sections 13(a) and 14(d) of the Exchange Act and applicable regulations. SAC ¶ 117. Lions Gate admitted that the statements made after the Transactions omitted certain facts by suggesting that the Transactions were part of a plan to reduce debt and did not disclose that Lions Gate had prearranged the Transactions and that the Transactions were part of a defensive strategy to maintain incumbent control. SAC ¶ 117.

The SAC alleges that upon the announcement of the settlement with the SEC on March 13, 2014, the shares of Lions Gate fell 3.2%, dropping from $33.26 a share to $32.20. SAC ¶ 163. The SAC further alleges that the price of Lions Gate stock continued to drop in the days following the settlement announcement, dropping to $30.33, or a decline of over 9%, by March 17, 2014. SAC ¶¶ 165-66.

The SAC alleges that Lions Gate misrepresented the status of the SEC staff investigation in the Forms 10-Q and 10-K, filed between February 2013 and March 2014, by stating that the Company did not believe that "the outcome of any currently pending claims or legal proceedings will have a material adverse effect on the Company's financial statements" or the "Company's

consolidated financial position, results of operations or cash flow." SAC ¶¶ 98, 101, 104, 107, 110. The SAC alleges the defendants purposely omitted material information about the Transactions, and that their silence on the true nature of the Transactions and the SEC investigation rendered the statements in the securities filings misleading. SAC ¶ 100. The SAC also alleges that general and administrative expenses increased in the third quarter of 2014, and that during an investor conference call on February 7, 2014, defendant Barge indicated that the increase in general and administrative expenses was due to "an accrual related to an anticipated settlement of a legal matter that goes back several years." SAC ¶ 113. When prompted for details, Barge declined to provide more information about the size of the settlement. SAC ¶ 114.

The SAC alleges that the individual defendants acted with scienter by recklessly disregarding the falsity of the information from previous statements in securities filings and because they failed to disclose or misrepresented the legal proceeding that was under way during the Class Period. SAC ¶¶ 119-22.  The SAC alleges that defendants Feltheimer, Keegan and Barge signed the securities filings, Forms 10-K and 10-Q, during the Class Period. SAC ¶ 124.

### III.

The defendants move to dismiss the claims asserted in the SAC for a violation of Section 10(b) and Rule 10b-5 because the plaintiffs have failed to allege material misstatements or omissions and because they have failed to allege scienter.

Section 10(b), as effectuated by Rule 10b-5, makes it "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To state a claim under Section 10(b) and Rule 10b-5, the plaintiffs must allege that the defendants, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiffs' reliance on the defendants' action caused injury to the plaintiffs. Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000); see also City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc., 814 F. Supp. 2d 395, 409 (S.D.N.Y. 2011).

The plaintiffs allege that from February 11, 2013 to March 13, 2014, the defendants failed to disclose an ongoing SEC investigation into possible wrongdoing and misstatements during the 2010 Transactions, and that this omission was material and

16

should have been disclosed. They also contend that the failure
to disclose the SEC investigation rendered misleading statements
about the potential adverse effect of pending litigation in the
Company's Forms 10-K and 10-Q during the Class Period. An
alleged omission of fact is material if there is "a substantial
likelihood that the disclosure of the omitted fact would have
been viewed by the reasonable investor as having significantly
altered the 'total mix' of information made available." Basic,
Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (internal citation
omitted). "Put another way, a fact is to be considered material
if there is a substantial likelihood that a reasonable person
would consider it important in deciding whether to buy or sell
shares of stock." Operating Local 649 Annuity Tr. Fund v. Smith
Barney Fund Mgmt. LLC, 595 F.3d 86, 92-93 (2d Cir. 2010)
(internal citation and quotation marks omitted); see also
Silsby, 17 F. Supp. 3d at 358.

"A[n] omission is actionable under federal securities laws
only when the [defendant] is subject to a duty to disclose the
omitted facts." In re Time Warner Inc. Sec. Litig., 9 F.3d 259,
267 (2d Cir. 1993). Even though Rule 10b-5 imposes no duty to
disclose all material, nonpublic information, once a party
chooses to speak, it has a "duty to be both accurate and
complete." Caiola v. Citibank, N.A., 295 F.3d 312, 331 (2d Cir.

17

2002). "[A]n entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it . . . materially misleading." In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008); see also City of Roseville, 814 F. Supp. 2d at 410. However, corporations are "not required to disclose a fact merely because a reasonable investor would very much like to know that fact." In re Optionable Sec. Litig., 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008) (quoting In re Time Warner, 9 F.3d at 267); see also In re Bank of Am. AIG Disclosure Sec. Litig., 980 F. Supp. 2d 564, 575 (S.D.N.Y. 2013), aff'd, 566 F. App'x 93 (2d Cir. 2014).

## A.

This case is about Lions Gate's disclosure obligations with respect to an SEC investigation and potential settlement. The plaintiffs argue that the SEC staff investigation and Wells Notices from the Enforcement Division triggered a duty of disclosure. The defendants contend that the plaintiffs have failed to plead that any omissions were material or that there was any duty to disclose the SEC investigation and Wells Notices. The defendants also contend that the plaintiffs have failed to prove that the actual disclosures were materially misleading.

**(1)**

**a.**

The defendants move to dismiss the SAC because the SAC fails to plead an actionable material omission. The defendants argue that the failure to disclose the Wells Notices and the SEC investigation more generally does not constitute an actionable omission because there was no duty to disclose the Wells Notices or the SEC investigation.

"'Silence, absent a duty to disclose, is not misleading under Rule 10b-5.'" Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 100-01 (2d Cir. 2015) (quoting Basic, 485 U.S. at 239 n. 17). "[A]n omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." Id. at 101 (internal citations omitted). "Such a duty may arise when there is a corporate insider trad[ing] on confidential information, a statute or regulation requiring disclosure, or a corporate statement that would otherwise be inaccurate, incomplete, or misleading." Id. (internal citations and quotation marks omitted). None of these duties are applicable in this case.

The SEC sends a Wells Notice to a target of an investigation when the Enforcement Division staff "decides, even preliminarily, to recommend charges." In re Initial Pub.

Offering Sec. Litig., No. 21-mc-92 (SAS), 2004 WL 60290, at *1
(S.D.N.Y. Jan. 12, 2004); see also SEC v. Internet Solutions for
Bus. Inc., 509 F.3d 1161, 1163 n. 1 (9th Cir. 2007). In
response, the target may provide a Wells submission to the SEC,
explaining why the Commission should reject the Enforcement
Division's recommendation to bring an enforcement action.
Richman v. Goldman Sachs Grp., Inc., 868 F. Supp. 2d 261, 272
(S.D.N.Y. 2012); 17 C.F.R. § 202.5. ("Persons who become
involved in preliminary or formal investigations may, on their
own initiative, submit a written statement to the Commission
setting forth their interests and position in regard to the
subject matter of the investigation. . . . In the event a
recommendation for the commencement of an enforcement proceeding
is presented by the staff, any submissions by interested persons
will be forwarded to the Commission in conjunction with the
staff memorandum."). It is possible that the Enforcement
Division may not proceed with a recommendation to commence an
action and the SEC may not authorize the filing of an action
even if the Enforcement Division recommends it. A Wells Notice
"does not necessarily indicate that charges will be filed."
Richman, 868 F. Supp. 2d at 272.

    In this case, Lions Gate and related individuals allegedly
received multiple Wells Notices in July 2012. SAC ¶ 84. The SEC

also allegedly served subpoenas on Lions Gate officials and representatives in June and July 2011. But the defendants did not have a duty to disclose the SEC investigation and Wells Notices because the securities laws do not impose an obligation on a company to predict the outcome of investigations. There is no duty to disclose litigation that is not "substantially certain to occur." See Richman, 868 F. Supp. 2d at 273-74 (internal citation omitted); In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), aff'd sub nom., Albert Fadem Trust v. Citigroup, Inc., 165 F. App'x 928 (2d Cir. 2006); In re Marsh & Mclennan Cos., Inc. Sec. Litig., 501 F. Supp. 2d 452, 471 (S.D.N.Y. 2006) ("With respect to a company's failure to disclose impending litigation, there is no requirement to make disclosures predicting such litigation, absent an allegation that the litigation was substantially certain to occur during the relevant period." (internal citations and quotations omitted)). In this case, the SEC never proceeded with a charge that Lions Gate violated Section 10(b) and Rule 10b-5 and never proceeded with any litigation against individual defendants, despite the issuance of Wells Notices discussing their potential liability. SAC ¶ 96; see Richman, 868 F. Supp. 2d at 274 ("Indeed, Plaintiffs cannot claim that a Wells Notice indicated that litigation was "substantially certain to occur"

because Jonathan Egol, a Goldman employee, received a Wells Notice regarding the Abacus transaction and ultimately was not sued by the SEC.").

The plaintiffs contend that the failure to disclose a government investigation is actionable. But a government investigation, without more, does not trigger a generalized duty to disclose. See In re UBS AG Sec. Litig., No. 07-cv-11225 (RJS), 2012 WL 4471265, at *31 (S.D.N.Y. Sept. 28, 2012), aff'd sub nom., City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173 (2d Cir. 2014) ("Indeed, absent an express prior disclosure, a corporation has no affirmative duty to speculate or disclose uncharged, unadjudicated wrongdoings or mismanagement, illegal internal policies, or violations of a company's internal codes of conduct and legal policies." (internal citations and quotation marks omitted)).

The cases the plaintiffs rely upon for a duty to disclose the Wells Notices and the SEC investigation are inapposite because (1) the defendants in those cases were subject to a pre-existing duty of disclosure under the securities laws or made express prior disclosures related to the investigation which were rendered materially misleading by omitting information about the investigation, and (2) the investigation itself was material. In Kline, a legal opinion letter about the tax

consequences of a company's trading program did not disclose the existence of an SEC investigation and an IRS audit that had started before the opinion was finalized. The Court of Appeals for the Third Circuit concluded that the IRS audit and SEC investigation were facts that "bear directly on the accuracy of the tax opinion" and thus had to be disclosed. Kline v. First W. Gov't Sec., Inc., 24 F.3d 480, 484, 491 (3d Cir. 1994). Similarly in In re China Valves Technology Securities Litigation, 979 F. Supp. 2d 395 (S.D.N.Y. 2013), a company's prospectus supplement failed to disclose that a company it acquired was subject to a Foreign Corrupt Practices Act investigation, and that omission was material. The future earnings potential of the acquired company were rendered uncertain once the FCPA investigation suggested that earlier earnings may have resulted from corruption and the violation could result in substantial penalties. Id. at 409.  And in No. 84 Employer-Teamster Joint Council Pension Trust Fund v. American West Holding Corporation, 320 F.3d 920 (9th Cir. 2003), the Ninth Circuit Court of Appeals concluded that when the company undertook to make affirmative representations about an investigation by the Federal Aviation Administration, the company also had to disclose "information regarding a company's deferred maintenance costs, unsafe maintenance practices, and

possible sanction" because "a reasonable investor would consider
the potential effects of each of these facts on the overall
economic health of the company as 'significantly alter[ing] the
'total mix' of information made available.'" Id. at 935
(citation omitted). And finally, in In re Bioscrip, a company's
affirmative statement that it was not presently in the process
of responding to an investigatory request from the Government
triggered a duty to disclose that it had in fact received a
civil investigative demand in an investigation relating to
violations of the Anti-Kickback Statute and False Claims Act. In
re BioScrip, Inc. Sec. Litig., 95 F. Supp. 3d 711, 727-28
(S.D.N.Y. 2015).

The plaintiffs' cases stand for the proposition that when a
company speaks on a subject, it cannot omit material facts about
that subject, and cannot make a material misrepresentation about
the existence of an investigation. But in this case, the
plaintiffs point to no statements during the Class Period about
the Transactions that were the subject of the SEC investigation
or about the SEC investigation itself. The Transactions were
completed in 2010 and the Class Period only began in February
11, 2013.

Moreover, the plaintiffs have failed to allege that the
investigation itself was material in that it "significantly

24

altered the total mix of information" available to an investor.
Basic, 485 U.S. at 231-32 (internal quotation marks omitted).
The $7.5 million civil penalty was less than one percent of
Lions Gate's consolidated revenue of $839.9 million for the
third quarter of 2014. SAC ¶ 153. That percentage is much lower
than the five percent numerical threshold that the Court of
Appeals for the Second Circuit has determined is a "good
starting place for assessing the materiality of the alleged
misstatement." See ECA, Local 134 IBEW Joint Pension Tr. of
Chicago v. JP Morgan Chase Co., 553 F.3d 187, 204 (2d Cir.
2009). Of course, a de minimis percentage of revenue is not
entirely dispositive of the materiality issue. See id.
(supplementing the quantitative inquiry by considering the
"qualitative factors that might contribute to a finding of
materiality"). But the plaintiffs do not explain any qualitative
factors that would plausibly show materiality.

The plaintiffs argue that the $7.5 million civil penalty
does not "undermine the reasonable likelihood that the penalty
*could have* materially affected" Lions Gate's financials "in some
respect." Pls.' Mem. of Law in Opp. to Defs.' Mot. to Dismiss at
15 (emphasis added). But the plaintiffs do not cite any
authority for the proposition that the possibility of
materiality is sufficient for a Rule 10b-5 claim. This is not a

case where the penalty imperiled an important line of business or a significant revenue stream. The plaintiffs argue that "uncertainty" or the potential risk of loss is itself material, citing Panther Partners Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114, 121-22 (2d Cir. 2012). But in Panther Partners, the Court of Appeals noted that for the purposes of the materiality analysis the complaint alleged that the company's defect rate not only created uncertainty as to whether the company would have to accept substantial returns of products but also that the defect rate affected 72% of revenues and the circumstances "were not simply 'potentially problematic' for the [c]ompany; they were very bad." Id. at 121-22 (citing Panther Partners Inc. v. Ikanos Commc'ns, Inc., 347 F. App'x 617, 622 (2d Cir. 2009)).[3] The materiality analysis thus requires a showing of actual materiality; the possibility that the information may be material does not suffice if a reasonable investor would not

_____

[3] The uncertainty argument also bears on the plaintiffs' Item 303 claim discussed below. The Court of Appeals has held that the test for materiality under Item 303 is distinct from the duty of disclosure. See Stratte-McClure, 776 F.3d at 103. The disclosure duties under Item 303 are _not_ co-extensive with the materiality requirements of Section 10b-5. See id. ("Since the Supreme Court's interpretation of "material" in Rule 10b-5 dictates whether a private plaintiff has properly stated a claim, we conclude that a violation of Item 303's disclosure requirements can only sustain a claim under Section 10(b) and Rule 10b-5 if the allegedly omitted information satisfies Basic's test for materiality. That is, a plaintiff must first allege that the defendant failed to comply with Item 303 in a 10-Q or other filing. Such a showing establishes that the defendant had a duty to disclose. A plaintiff must then allege that the omitted information was material under Basic's probability/magnitude test[.]").

view the information as significantly altering the total mix of information available.

In this case, the plaintiffs have not pleaded how the knowledge of a preliminary SEC staff investigation, for which there was no settlement in place during the Class Period, would have significantly altered an investor's total mix of information. See Basic, 485 U.S. at 231–32. The SAC alleges that "Lions Gate was exposed to the risk and/or uncertainty that the investigations were reasonably likely to result in a significant fine, financial penalty, or reputational harm, and/or have an adverse impact on revenues and operations." SAC ¶ 134. The SAC also alleges that the SEC required payment of the $7.5 million civil penalty within ten business days of the entry of the order, and that $7.5 million represented nearly 10% of Lions Gate's cash on hand. SAC ¶ 155. The plaintiffs do not cite any case that measures materiality based on a company's cash on hand. Moreover, Lions Gate disclosed the civil penalty amount as soon as it entered into the settlement and order with the SEC on March 13, 2014. SAC ¶ 116. The securities laws do not require a company to hypothesize the worst results of an investigation when those results do not materialize and when the company chooses not to speak about the investigation.

Thus, the SAC fails to allege that there was a general duty to disclose the SEC investigation, the Wells Notices, or the SEC settlement amount prior to March 13, 2014, and has failed to allege that these items were material.

### b.

The plaintiffs argue that the defendants had a duty to disclose the SEC investigation and the Wells Notices because they misled investors by mentioning that Lions Gate was involved in "certain claims and legal proceedings" but omitting the fact that the SEC Enforcement Division was investigating the Transactions and that the SEC had issued Wells Notices to Lions Gate and some of the individual defendants in mid-2012. The plaintiffs contend that Lions Gate's omissions rendered the statements in Forms 10-K and 10-Q in 2013 and 2014 false and misleading.

Although there is no independent duty to disclose a Wells Notice or an SEC investigation, if one chooses to speak on a subject, "one must speak truthfully about material issues. . . . [A company] ha[s] a duty to be both accurate and complete." Caiola, 295 F.3d at 331. A corporation, however, "only [has to reveal] such [facts], if any, that are needed so that what was revealed would not be so incomplete as to mislead." In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 160

(S.D.N.Y. 2008) (citation omitted). "[T]he federal securities
laws do not require a company to accuse itself of wrongdoing."
In re Citigroup, 330 F. Supp. 2d at 377 (citing In re Am.
Express Co. Shareholder Litig., 840 F. Supp. 260, 269-70
(S.D.N.Y. 1993)). Under the PSRLA, the plaintiffs must specify
the "reason or reasons why the statement is misleading" and
state with particularity the facts on which that belief is
formed. 15 U.S.C. § 78u-4(b)(1).

The SAC fails to plead how the statements Lions Gate made
in the Form 10-K and Form 10-Q filings were materially false or
misleading. The February 11, 2013 Form 10-Q stated as follows:

> From time to time, the Company is involved in certain
> claims and legal proceedings arising in the normal
> course of business. While the resolution of these
> matters cannot be predicted with certainty, the
> Company does not believe, based on current knowledge,
> that the outcome of any currently pending claims or
> legal proceedings in which the Company is currently
> involved will have a material adverse effect on the
> Company's financial statements.

SAC ¶ 98 (emphasis omitted). The same statement with respect to
no material adverse effect was made with respect to the
Company's "consolidated financial position, results of
operations or cash flow." Id. The same statements were repeated
in the May 30, 2013 Form 10-K, in the November 8, 2013 Form 10-
Q, and in the February 6, 2014 Form 10-Q. SAC ¶¶ 101, 107, 110.
The plaintiffs contend that the defendants' disclosures were

materially misleading because Lions Gate failed to disclose the
SEC investigation and the Wells Notices.[4]

There was in fact nothing false or misleading about Lion
Gate's statements. They accurately describe that there were
currently pending claims or legal proceedings but the Company
did not believe that the outcome would have a material adverse
effect on certain of the Company's financial measurements, an
opinion that proved to be correct. Moreover, the plaintiffs have
failed to plead how the defendants' opinions were not supported
by the facts known to them at the time. See Omnicare, Inc. v.
Laborers Dist. Council Constr. Indus. Pension Fund, 135 S. Ct.
1318, 1332 (2015) ("The investor must identify particular (and
material) facts going to the basis for the issuer's opinion—
facts about the inquiry the issuer did or did not conduct or the
knowledge it did or did not have—whose omission makes the
opinion statement at issue misleading to a reasonable person
reading the statement fairly and in context. . . .  That is no
small task for an investor.").

---

[4] This claim is internally inconsistent with the plaintiffs' other argument
that Lions Gate "never disclosed any aspect of the SEC Investigation." Pls.'
Mem. of Law in Opp. to Defs.' Mot. to Dismiss at 11. Although the disclosures
in the Form 10-Q filing are not specific, the statements plainly acknowledge
the existence of a "currently pending claim[] or legal proceeding[]." E.g.,
SAC ¶ 98.

The plaintiffs contend that the statements in Form 10-K and 10-Q filings were crafted to be literally accurate while still misleading investors about the fact that the SEC was investigating Lions Gate and the Enforcement Division was considering recommending a civil action.[5] The SAC does not allege so-called "half-truths" by the defendants where the statements mislead investors by "saying one thing and holding back another." See id. at 1331. The SAC at most pleads that the defendants disclosed an investigation was ongoing, but refused to provide details. Pls.' Mem. of Law in Opp. to Defs.' Mot. to Dismiss at 14. This is not a case where the defendants selectively disclosed information and omitted known adverse facts that would undermine the truth of the disclosures. Here, the statements acknowledged there were pending claims or legal proceedings and stated that the Company did not believe a material adverse effect would arise from these claims. The plaintiffs have not pleaded how the details of the SEC

---

[5] The SAC also does not allege how the disclosure in Lions Gate's Form 10-Q filing about the increase in general and administrative expenses was false. There is no allegation that the amounts were misstated and the Company disclosed the next day in an investor call that the increase was due in part to "an anticipated settlement of a legal matter." SAC ¶¶ 112-13. The plaintiffs do not allege the falsity of these statements in their papers. At most, the plaintiffs argue that the defendants should have provided more details, but do not argue that the lack of detail rendered the statements in their original form misleading. Moreover, the market was actually apprised that there was an ongoing investigation and that Lions Gate's management would not comment on any details, and the market could price that information or lack thereof accordingly. See SAC ¶ 114 ("[F]or obvious business reasons we are not going to break that amount out before final settlement. What I can tell you is that we do not expect any further accrual on this matter.").

investigation or the Wells Notices undercut the Company's
statement of belief or how the knowledge of those details would
conflict with the statement Lions Gate made. SAC ¶¶ 98, 101,
104, 107, 110; Omnicare, 132 S. Ct. at 1329 (concluding in a
Section 11 case, that there may be liability if a statement of
opinion omits material facts about the party's "knowledge
concerning a statement of opinion, and if those *facts conflict*
*with* what a reasonable investor would take from the statement
itself" (emphasis added)). In this case, the defendants'
statements were not false or misleading.

### c.

The plaintiffs next argue that Lions Gate had the duty to
correct their prior allegedly false statements in 2010 about the
Transactions. But the Class Period does not cover the allegedly
misleading filings related to the Transactions in 2010. The
plaintiffs contend that the 2010 Transactions and statements are
nevertheless relevant because the underlying falsity of those
statements made it necessary for the defendants to disclose the
SEC investigation and the receipt of the Wells Notices during
the Class Period. According to the SAC, the statements
describing the 2010 Transactions were false because they (1)
stated that the Transactions were part of the Company's
"previously announced plan to reduce its total debt" when no

such plan had been announced, SAC ¶ 57; (2) failed to disclose
that Rachesky, an insider, increased his interest in Lions Gate,
SAC ¶ 59; (3) failed to disclose that the Transactions were part
of a plan devised by Lions Gate's management and the Board to
thwart Icahn's takeover. SAC ¶ 58. The 2010 Transactions were
disclosed in a series of securities filings: a July 20, 2010
Form 8-K that announced the Transactions, Item 6 of the Schedule
14D-9 filed on August 2, 2010, and a September 8, 2010 amendment
to the Schedule 14D-9. Ex. 1 to SAC, Order Instituting Cease-
And-Desist Proceedings, ¶¶ 34, 37-38, 42-44.

The SAC fails to allege the existence of a duty to correct
during the Class Period because the duty to correct the
statements about the 2010 Transactions did not arise during the
Class Period. The plaintiffs argue that the defendants knew that
the SEC investigation which began in 2012 would reveal the
underlying falsehoods they had disseminated about the
Transactions, and this triggered the defendants' duty to correct
the 2010 statements in 2013 and 2014. But the Court of Appeals
has held that the duty to correct previous misstatements does
not apply where the defendants made the original statements
before the Class Period and became aware of the errors in those
statements before the Class Period. See Lattanzio v. Deloitte &
Touche LLP, 476 F.3d 147, 154 (2d Cir. 2007). Any other rule

would undercut the meaning of the Class Period and eviscerate the statute of limitations. It could always be argued that allegedly false statements made long before the Class Period and outside the statute of limitations should be corrected by a statement within the Class Period. But the duty to correct is not a continuous duty of disclosure. To impose a never-ending duty of disclosure would circumvent the general rule that pre-Class Period statements are not actionable. See id. at 153-54 (citing In re Int'l Bus. Mach. Corp. Sec. Litig., 163 F.3d 102, 107 (2d Cir. 1998)); Wilder v. News Corp., No. 11-cv-4947 (PGG), 2014 WL 1315960, at *7 (S.D.N.Y. Mar. 31, 2014).

The duty to correct arises at the moment the defendants learned that the 2010 statements were false. See Wilder, 2014 WL 1315960, at 7-8 (citing Lattanzio, 476 F.3d at 153-54). The SAC alleges that the 2010 statements were misrepresentations *at the time they were made* in July and August 2010 that belied the "true purpose" of the Transactions. SAC ¶¶ 58-61. The SAC alleges that the concealment and misrepresentation were part of a plan devised by the management and Board of Lions Gate in 2010. SAC ¶ 58. Thus, the duty to correct does not apply to the plaintiffs' present proposed class action alleging securities violations from February 2013 to March 2014.

Moreover, the plaintiffs fail to allege how the details of the takeover battle in 2010 between Lions Gate management and Icahn would have been material during the Class Period spanning from February 2013 to March 2014. The duty to correct does not obviate the requirement that the correcting information be material. Overton v. Todman & Co., CPAs, P.C., 478 F.3d 479, 487 & n.1 (2d Cir. 2007) (holding that the duty to correct gives rise to Section 10(b) liability when among other things, "all the requirements for liability are satisfied").

In this case, the SEC order and Lions Gate admissions only speak to the materiality of the omitted information about the 2010 Transactions as of the time of the initial disclosures in July and August 2010. See Ex. 1 to SAC, Order Instituting Cease-And-Desist Proceedings, Annex A, ¶¶ 33-44. The SAC does not allege how the truth of the underlying Transactions would have affected the trading decisions of investors and the "total mix" of information in 2013 and 2014. See SAC ¶ 129. The Transactions had already been completed in 2010.

Thus, the SAC fails to allege that the defendants had a duty to correct statements that were made before the Class Period.

**(2)**

The plaintiffs next argue that Regulation S-K creates a duty to disclose. The plaintiffs rely on several provisions of Regulation S-K. The plaintiffs contend that the securities filings omitted disclosures required under three sections of SEC Regulation S-K: 17 C.F.R. §§ 229.103 ("Item 103"), 229.303(a)(3)(ii) ("Item 303"), and 229.503 ("Item 503"), and that the failure to disclose the SEC investigation and the Wells Notices constituted a violation of Generally Accepted Accounting Principles ("GAAP"), specifically a violation of Accounting Standards Codification 450 ("ASC 450"). None of these provisions created an affirmative duty to disclose the allegedly omitted information.

**a.**

The plaintiffs argue that Lions Gate's duty to disclose the investigation arises from Item 103 of Regulation S-K. Under Regulation S-K Item 103**,** a company is required to "[d]escribe briefly any material pending legal proceedings . . . known to be contemplated by governmental authorities." 17 C.F.R. § 229.103. Section 240.12b-20 "supplements Regulation S-K by requiring a person who has provided such information in 'a statement or report . . . [to] add[ ] such further material information, if any, as may be necessary to make the required statements, in

light of the circumstances under which they are made, not misleading.'" Richman, 868 F. Supp. 2d at 272 (quoting United States v. Yeaman, 987 F. Supp. 373, 381 (E.D. Pa. 1997)). Item 103 provides an exclusion for legal proceedings involving primarily a claim for damages if the amount involved, exclusive of interest and costs, does not exceed ten percent of the current assets of the company and its subsidiaries on a consolidated basis. 17 C.F.R. § 229.103(2). In the context of a case where more than thirty states were investigating whether an insurance company had violated state unclaimed property laws, Item 103 was held to be inapplicable because a state investigation is not a "pending legal proceeding." City of Westland Police & Fire Ret. Sys. v. MetLife, Inc., 928 F. Supp. 2d 705, 711, 718 (S.D.N.Y. 2013).

Here, the issue is whether the SEC investigation was a "pending legal proceeding" or one "known to be contemplated by governmental authorities" that Lions Gate had to disclose pursuant to Item 103. The defendants correctly point out that there was no pending legal proceeding until the SEC commenced the administrative proceeding on March 13, 2014. SAC ¶ 96. The SEC investigation was not a "pending legal proceeding" in this case, because the SEC had not yet decided whether it would charge Lions Gate and the individual defendants with securities

37

violations. The complaint only alleges that the SEC undertook different avenues of investigation, subpoenaing documents and sworn testimony, as well as subpoenaing materials from Board meetings and metadata of previous drafts of the Board minutes and Transaction information. E.g., SAC ¶¶ 81-82. But an investigation alone is not a "pending legal proceeding" or a "proceeding[] known to be contemplated by governmental authorities" under Item 103. See City of Westland, 928 F. Supp. 2d at 718.

Indeed, Item 103 requires that the issuer "[i]nclude the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceeding and the relief sought. Include similar information as to any such proceedings known to be contemplated by governmental authorities." 17 C.F.R. § 229.103. During the Class Period, the defendants could not have provided any of this information because the SEC had not filed an action.

Moreover, the issuances of the Wells Notices did not mark the beginning of a "pending legal proceeding." A Wells Notice only informs an individual or company that the SEC Enforcement Division staff is considering recommending that the SEC file an action, but the SEC itself has not yet determined whether or not

38

to bring a case. See Richman, 868 F. Supp. 2d at 272 ("A Wells Notice may be considered an indication that the staff of a government agency is considering making a recommendation, but that is well short of litigation." (internal citation omitted)). "At best, a Wells Notice indicates not litigation but only the desire of the Enforcement staff to move forward, which it has no power to effectuate." Id. at 274. Similarly, the Wells Notice in this case only informed the defendants that the SEC Enforcement Division was "considering recommending that the Commission file a civil action." Norton Decl., Ex. D. The Wells Notice only alerted the defendants to the possibility of a possible recommendation to the Commission, not that the Commission was itself contemplating action, and indeed no action was ever brought against individual defendants who received Wells Notices. As the defendants point out, premature disclosure of the Wells Notice would have resulted in Lions Gate disclosing that the SEC Enforcement Division was investigating the defendants for fraud violations under Rules 10b-5 and 12b-20, see Norton Decl., Ex. D, claims which the Commission ultimately did not pursue. See Ex. 1 to SAC, Order Instituting Cease-And-Desist Proceedings, at 11.

The defendants also argue that Lions Gate did not have a duty to disclose the staff investigation in this case because

39

the investigation does not satisfy Item 103's materiality test. As discussed above, the SEC investigation and Wells Notices are also not material under the Basic test. Item 103 provides a distinct materiality test because it states that "[n]o information need be given with respect to any proceeding that involves primarily a claim for damages if the amount involved, exclusive of interest and costs, does not exceed 10 percent of the current assets of the registrant and its subsidiaries on a consolidated basis." 17 C.F.R. § 229.103(2). The plaintiffs have not alleged that the civil penalty sought by the SEC exceeded ten percent of the Company's assets and subsidiaries on a consolidated basis. While the plaintiffs point out that the Wells Notices indicated that the Enforcement Division might seek a permanent injunction against future violations of the securities laws, there is no allegation that the possibility of an injunction would have a material effect on Lion Gate's assets. In any event, any claim under Item 103 fails for failure to make a plausible allegation of materiality under Basic.

For these reasons, the plaintiffs cannot show that the defendants had a duty to disclose the SEC investigation or the Wells Notices under Item 103 of Regulation S-K.

**b.**

The plaintiffs also argue that the defendants violated their obligation under Item 303 of Regulation S-K to disclose "any known trends . . . or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." 17 C.F.R. § 229.303(a)(1). Item 303 "imposes a disclosure duty where a trend, demand, commitment, event or uncertainty is both (1) presently known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operations." Panther Partners, 681 F.3d at 120 (internal quotation marks omitted).

An SEC investigation could not be characterized as a "known trend" or "uncertainty" under Item 303. This is not a case like Stratte-McClure where Morgan Stanley faced a deteriorating subprime mortgage market that, in light of the company's exposure to the market, was likely to cause trading losses that would materially affect the company's financial condition. Stratte-McClure, 776 F.3d at 97, 104. In this case, the plaintiffs do not point to any set of facts that remotely create a "trend." Nor do they point to any "uncertainty" that is linked to the company's liquidity. The plaintiffs at best allege an isolated incident where the defendants allegedly undertook a

41

defensive recapitalization by arranging a series of allegedly deceptive transactions and then the SEC began an investigation.

The SAC also does not allege that the settlement or investigation were reasonably expected to have a material effect on Lions Gate's liquidity. The SAC does not allege that it was reasonably likely that the SEC settlement could have been higher than the relatively immaterial amount of $7.5 million. At most the SAC only alludes to a vague possibility of a much higher settlement, stating that "Lionsgate faced the prospect that the SEC could access a higher fee." SAC ¶ 154; In re Bank of Am., 980 F. Supp. 2d at 584-85 (reasoning that where the expected loss was not enough to require accrual and the plaintiffs only alleged that a suit was "reasonably possible" the plaintiffs had failed to allege the required likelihood of loss under Item 303). In this case, while there was an accrual in February 2014, this accrual does not indicate that Lions Gate was anticipating a very large settlement that would have a material effect on revenues. SAC ¶¶ 112-14, 153 (noting an increase in general and administrative expenses of $18.7 million, which included an accrual for legal matters). Thus, the SAC fails to plead a violation of the disclosure duties in Item 303.

Moreover, while a failure to make a required disclosure under Item 303 in a Form 10-Q filing is an omission that can

serve as the basis for a Section 10(b) securities fraud claim, the omission is only actionable if it satisfies the materiality requirement under <u>Basic</u> and if all the other requirements to sustain a securities fraud action are met. <u>Stratte-McClure</u>, 776 F.3d at 100. By making the <u>Basic</u> test a prerequisite to a successful Item 303 claim, the Court of Appeals acknowledged some difference between the two tests for materiality. <u>Id.</u> at 102-03. In this case, the plaintiffs do not make the required showing that the settlement was reasonably likely to have a material effect on Lions Gate's liquidity, thereby failing the Item 303 test, and they also fail to satisfy the materiality standard under <u>Basic</u>. The plaintiffs do not allege that the settlement amount was material, only that the settlement could have been very large.

### c.

The plaintiffs next argue that the defendants also had a duty to disclose the SEC investigation and Wells Notices under Item 503(c) of Regulation S-K. Item 503 requires that certain filings "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c). The risk factors in the regulation include a company's "lack of an operating history," "lack of profitable operations in recent periods," and

"financial position." Id. The plaintiffs point out that Lions Gate did not update the risk factors to include a material change or a factor arising from the SEC investigation. SAC ¶¶ 135-36. The SEC investigation in this case did not bear on any of these risk factors. While there was a possibility of a civil penalty, and indeed a $7.5 million civil penalty was ultimately assessed against Lions Gate, the complaint does not plausibly allege that this civil penalty put Lions Gate's profits at risk or made the stock "risky" as a result of Lions Gate's ongoing operations.

Moreover, the complaint fails to allege the materiality of the SEC investigation under Basic, and therefore, the lack of disclosure is not actionable because Item 503 only applies to the "most significant" risk factors. See City of Roseville, 814 F. Supp. 2d at 426 (noting the dearth of case law on Item 503, and that courts typically analyze the sufficiency of Item 503 disclosures with "the familiar materiality standard" of a Rule 10b-5 violation).

For these reasons, the plaintiffs fail to allege that the defendants had a duty to disclose the SEC investigation and Wells Notices under Item 503(c) of Regulation S-K.

**d.**

The plaintiffs also contend that pursuant to Generally
Accepted Accounting Principles ("GAAP") Lions Gate should have
disclosed the SEC investigation and Wells Notice because Lions
Gate knew "no later than July 2012" of the SEC's "awareness of a
possible claim." The plaintiffs specifically rely on Accounting
Standards Certification Topic 450 ("ASC 450"), which provides
accounting guidance for the accrual and disclosure of certain
loss contingencies. The plaintiffs argue that the SEC
investigation was a loss contingency that needed to be disclosed
because it was reasonably possible that the SEC would assert a
claim against Lions Gate. Under ASC 450, loss contingencies must
be accrued when information available before financial
statements are issued suggests that a loss contingency is
probable and can be reasonably estimated. ASC ¶ 450-20-25. When
accrual is not required, a loss contingency must be disclosed if
it is reasonably possible; that is, if the likelihood that it
will occur is more than remote but less than likely. ASC ¶¶ 450-
20-50-3; 450-20-20 Glossary. Under ASC 450, threatened
litigation may qualify as a loss contingency when the potential
claimant has manifested awareness of the claim. See ASC ¶ 450-
20-50-6. Three factors are relevant in determining whether
threatened litigation constitutes a qualifying loss contingency

subject to accrual or disclosure: (1) when the cause of action arose; (2) the degree of probability of an unfavorable outcome; and (3) the ability to make a reasonable estimate of loss. ASC ¶ 450-20-55-10; see also In re Bank of Am., 980 F. Supp. 2d at 583.

The plaintiffs' argument fails because as in City of Westland, the investigation was not pending or threatened litigation. See 928 F. Supp. 2d at 718. Moreover, no disclosure was required because there is no plausible allegation that the amount of the loss could have been estimated until Lions Gate filed its third quarter 10-Q on February 6, 2014, at which point Lions Gate accrued an expense for the possible settlement. SAC ¶¶ 110-13. The Company disclosed the actual amount of the settlement when it was finalized on March 13, 2014. SAC ¶ 116. The plaintiffs thus fail to allege a violation of ASC 450.[6]  See In re Bank of Am., 980 F. Supp. 2d at 583-84; ASC 450.

Therefore, the SAC fails to allege a materially false or misleading statement. The SAC also does not allege that the defendants were subject to a duty to disclose arising from their

---

[6] Because the plaintiffs have failed to plead scienter, as discussed below, the plaintiffs' ASC 450 violation claim also fails because "[o]nly where [allegations of GAAP violations] are coupled with evidence of corresponding fraudulent intent . . . might they be sufficient" to state a claim for a Section 10(b) violation. Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000) (citation and internal quotation marks omitted); In re Citigroup, 330 F. Supp. 2d at 378.

prior statements or regulatory requirements. Because the plaintiffs have failed to allege a material misstatement or omission, their claim for a violation of Section 10(b) and Rule 10b-5 should be dismissed.

## B.

The defendants also argue that the plaintiffs' claim for a violation of Section 10(b) and Rule 10b-5 should also be dismissed because the plaintiffs have not alleged facts sufficient to support a strong inference of scienter. The scienter required to support a securities fraud claim can be "intent to deceive, manipulate, or defraud, or at least knowing misconduct." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996) (internal citations omitted). The PSLRA requires that a complaint alleging securities fraud "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Scienter may be inferred from (1) facts showing that a defendant had "both motive and opportunity to commit the fraud," or (2) facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." ATSI, 493 F.3d at 99; see also City of Roseville, 814 F. Supp. 2d at 418-19.

In order to plead scienter adequately, the plaintiffs must allege facts supporting a strong inference with respect to each defendant. See Plumbers & Pipefitters Local Union No. 630 Pension–Annuity Tr. Fund v. Arbitron Inc., 741 F. Supp. 2d 474, 488 (S.D.N.Y. 2010). "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007). A complaint sufficiently alleges scienter when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324; see also Slayton v. Am. Express Co., 604 F.3d 758, 766 (2d Cir. 2010).

To raise a strong inference of scienter through motive and opportunity to defraud, a plaintiff must allege that the defendants "'benefitted in some concrete and personal way from the purported fraud.'" ECA Local, 553 F.3d at 198 (quoting Novak v. Kasaks, 216 F.3d 300, 307–08 (2d Cir. 2000)). "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." Id. Motive is generally shown by alleging that corporate insiders made the

misrepresentation in order to sell their own shares at a profit.
Id.

Where the defendants' motive to commit fraud is not
apparent, "the strength of the circumstantial allegations [that
a defendant consciously or recklessly misbehaved] must be
correspondingly greater." Kalnit v. Eichler, 264 F.3d 131, 142
(2d Cir. 2001) (internal citation and quotation marks omitted).
Plaintiffs typically allege conscious or reckless misbehavior by
pleading with specificity that the defendants had "knowledge of
facts or access to information contradicting their public
statements." Novak, 216 F.3d at 308. As the Second Circuit Court
of Appeals has explained, "[r]eckless conduct is, at the least,
conduct which is highly unreasonable and which represents an
extreme departure from the standards of ordinary care ... to the
extent that the danger was either known to the defendant or so
obvious that the defendant must have been aware of it." Chill v.
Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996) (alterations in
original) (internal citation and quotations marks omitted); see
also Silsby, 17 F. Supp. 3d at 364–66; Plumbers, 89 F. Supp. 3d
at 614.

Because the plaintiffs allege fraudulent omissions, rather
than false statements, "it is especially important to rigorously
apply the standard for pleading intent." In re GeoPharma, Inc.

Sec. Litig., 411 F. Supp. 2d 434, 437 (S.D.N.Y. 2006); see also
In re Bank of Am., 980 F. Supp. 2d at 586.

### (1)

The plaintiffs argue that they have sufficiently alleged
that the defendants acted with "motive and opportunity" to
defraud. They contend that the "concrete benefit" the defendants
enjoyed was retaining control over the management of Lions Gate.
The plaintiffs argue that the individual defendants were
primarily motivated to prevent Icahn's hostile takeover bid and
retain their control of the Company. But the plaintiffs do not
explain how the nondisclosure of the SEC investigation in 2013
and 2014 would enable the defendants to retain control of Lions
Gate. The takeover battle occurred in 2010, but the statements
from the Class Period were in securities filings filed in 2013
and 2014. The plaintiffs have failed to connect the motive to
the allegedly materially false statements or omissions. The
alleged omissions about the SEC investigation were irrelevant to
the hostile takeover bid that Lions Gate had rebuffed four years
earlier. The plaintiffs' argument may be relevant to the
motivation behind the alleged misstatements from 2010 in
connection with Lions Gate's description of the Transactions.
But all those statements predate the Class Period and cannot
support the plaintiffs' Rule 10b-5 claim in this case.

The plaintiffs also make a generalized allegation in their motion papers that KCM and Rachesky were enriched because Rachesky purchased the shares in 2010 as part of the defensive recapitalization and sold 10 million shares in 2015. But Rachesky and KCM are not defendants in this action. Although it is possible to allege corporate scienter by pleading facts that someone whose intent could be imputed to the corporation acted with scienter, the SAC does not attempt to do so. See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008). The SAC does not plead that Lions Gate failed to disclose the SEC investigation in 2013 and 2014 because Rachesky wanted to sell shares of Lions Gate stock, nor does the SAC plead that Rachesky had insider information that prompted him to sell his shares in 2015. Moreover, the plaintiffs have failed to plead any connection between the alleged omissions in 2013 and 2014 with any benefit to Rachesky and KCM which would have occurred in 2010. The plaintiffs therefore have not pleaded scienter by showing that the defendants had a motive and opportunity to commit fraud.

### (2)

The plaintiffs also attempt to allege scienter by pleading that the defendants recklessly disregarded that the statements issued were materially false or misleading. The SAC does not

51

sufficiently allege that the defendants acted with reckless disregard of a known or obvious duty.

There are no statements that the plaintiffs rely upon that were false and thus they have not alleged that the defendants knew or were reckless in not knowing that the statements were false. The closest that the plaintiffs come to alleged misstatements is the oft-repeated statement that Lions Gate did not "believe, based on current knowledge, that the outcome of any currently pending claims or legal proceedings . . . will have a material adverse effect on the Company's financial statements." SAC ¶ 98; see also SAC ¶¶ 101, 104, 107, 110. The SAC does not allege that the defendants did not genuinely believe in the statements about the lack of material adverse effect the investigation would have on Lions Gate's finances. See Omnicare, 135 S. Ct. at 1332. Moreover, the SAC fails to provide any factual allegations as to why the defendants would have believed that the investigation would have had a material adverse effect on Lions Gate's financial statements.

Moreover, alleging that the disclosures in the securities filings were incomplete or that they omitted material information, is not enough to plead scienter based on conscious misbehavior or recklessness. See In re Canandaigua Sec. Litig., 944 F. Supp. 1202, 1214 (S.D.N.Y. 1996) ("Absent some allegation

that defendants knew or were highly unreasonable in not knowing that they were doing something illicit, the complaint fails to adequately plead scienter." (internal quotation marks omitted)). There was authority that supported Lions Gate's failure to disclose the ongoing SEC investigation and Wells Notices. See, e.g., Richman, 868 F. Supp. 2d at 272-76. Further, none of the specific provisions on which the plaintiffs relied required the disclosure of the specific SEC investigation and the Wells Notices. Regulation S-K, Item 103, Item 503, Item 303, and ASC 450 do not create a duty to disclose, much less an obvious duty to disclose. See id. at 276. Because there is no clear case law that would require the disclosure of the SEC investigation and the Wells Notices in the absence of a pre-existing duty to disclose, the plaintiffs cannot show that the defendants acted in reckless disregard of the securities laws. See In re Bank of Am., 980 F. Supp. 2d at 587.

The complaint does not allege facts supporting a strong inference of scienter with respect to any defendant. Several factors including the disclosure of the general and administrative expense accrual related to the SEC investigation, the small civil penalty the SEC imposed relative to the Company's net assets, the uncertainty of whether the Commission would move forward with the proceedings against Lions Gate, and

53

the fact the Commission never brought charges against individual officers or directors support an inference against scienter that is far stronger than the competing inference that the plaintiffs suggest. The more cogent inference is that Lions Gate did not specifically disclose the investigation until the settlement had been concluded because it did not believe that there was a requirement to do so. See Stratte-McClure, 776 F.3d at 107. The defendants did not think it was necessary to disclose publicly the details of a settlement that was still subject to negotiation. See In re Bank of Am., 980 F. Supp. 2d at 587.

Thus, the plaintiffs have failed to allege the requisite scienter necessary to sustain an action for securities fraud under Section 10(b) and Rule 10b-5.

**IV.**

The plaintiffs also allege that the individual defendants are liable under Section 20(a) of the Exchange Act because they controlled Lions Gate, which in turn violated Section 10(b) and Rule 10b-5. Section 20(a) provides:

> Every person who, directly, or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and

               did not directly or indirectly induce the
act or acts constituting the violation or
cause of action.

15 U.S.C. § 78t(a). "To establish a prima facie case of control
person liability, a plaintiff must show (1) a primary violation
by the controlled person, (2) control of the primary violator by
the defendant, and (3) that the defendant was, in some
meaningful sense, a culpable participant in the controlled
person's fraud." ATSI, 493 F.3d at 108; see also Plumbers, 89 F.
Supp. 3d at 621. In this case, the plaintiffs have not alleged a
primary violation of Section 10(b) and Rule 10b-5. Accordingly,
the plaintiffs have not satisfied the first element of a Section
20(a) claim, and that claim must also be dismissed.

**CONCLUSION**

The Court has considered all of the remaining arguments of the parties. To the extent not specifically addressed above, they are either moot or without merit. For the foregoing reasons, the defendants' motion to dismiss is **granted.**  The Clerk is directed to enter judgment dismissing this action and closing the case. The Clerk is also directed to close all pending motions.

**SO ORDERED.**

**Dated:**     **New York, New York**
            **January 22, 2016**

_____/s/_____

            **John G. Koeltl**
**United States District Judge**